# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of S.D.*, 2012 IL App (1st) 101876

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF S.D., Petitioner-Appellant, and N.D., Respondent-Appellee. |
| District & No. | First District, Second Division<br>Docket Nos. 1-10-1876, 1-10-1882, 1-10-2634, 1-10-2635, 1-10-3262, 1-10-3263 cons. |
| Filed | November 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In postjudgment proceedings arising from the dissolution of the parties' marriage, the trial court properly considered the wife's petition as a petition to modify rather than review support, the trial court did not err in applying the substantial change in circumstances standard to her petition, respondent husband was properly granted a retroactive decrease in his maintenance obligation, and petitioner was properly found liable for respondent's attorney fees pursuant to the penalty clause in the parties' settlement agreement. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-D-4139; the Hon. Mark Lopez, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Burton F. Grant and Moria Berstein, both of Grant & Grant, of Chicago, for appellant.

Grund & Leavitt, P.C., of Chicago (Adam C. Kibort, Marvin J. Leavitt, and David C. Adams, of counsel), for appellee.

Panel

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Quinn and Connors concurred in the judgment and opinion.

## OPINION

¶ 1  Petitioner S.D. appeals the order of the circuit court denying her petition to extend maintenance and granting respondent N.D.'s petition to modify maintenance. On appeal, S.D. contends the trial court (1) erred in characterizing her petition as a petition to modify support instead of a petition to review support; (2) erroneously applied the substantial change in circumstances standard to her petition; (3) erred in granting N.D.'s petition to modify maintenance and in determining the amount of maintenance; (4) erred in making the decreased maintenance retroactive to February 9, 2009; (5) erroneously applied the penalty clause of the parties' marital settlement agreement (MSA), finding S.D. and her attorneys liable for respondent's attorney fees; and (6) abused its discretion in awarding N.D. $78,500 in attorney fees. For the following reasons, we affirm.

¶ 2                                    JURISDICTION

¶ 3  The trial court issued orders on June 3, 2010, August 10, 2010 and October 14, 2010. A final order disposing of petitioner's maintenance claim was entered on October 14, 2010. Notices of appeal were filed on July 2, 2010, September 7, 2010 and October 29, 2010. All appeals were consolidated into the present appeal. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 4                                    BACKGROUND

¶ 5  S.D. and N.D. were married on June 16, 1979. Two children were born during the parties' marriage: J.D., born May 12, 1985, and Sa. D., born February 17, 1990. On January 20, 2005, the trial court entered a judgment for dissolution of marriage and incorporated the MSA into the judgment. Article III of the MSA provides:

"3.1 Child Support. Both parties agree that application of the guidelines under Section 505 of the [Illinois Marriage and Dissolution of Marriage Act (the Act) (750

-2-

ILCS 5/504(a) (West 2006))] would be inappropriate and not in the best interests of the children in light of the needs of each child and the financial resources of each party ***.

* * *

3.2 Emancipation. 'Emancipation' is deemed to have occurred upon the happening of one of the following, at which time [N.D's] obligation for the child as detailed in this Agreement may be modified or terminated.

(a) The child reaching age 18, or the child's graduation from high school, whichever shall last occur;

* * *

(c) The child's having a permanent residence away from the permanent residence of [S.D.] A resident at boarding school *** is not deemed a residence away from the permanent residence of [S.D.]

* * *

3.4 Unallocated Support. [N.D.] shall pay unallocated maintenance and child support to [S.D.] as follows, which said amounts are based upon [N.D.'s] gross income history for the tax years 2001, 2002, and 2003 (average gross income for the said tax years is $973,836.00 per year):

(a) Commencing on January 1, 2005, [N.D.] shall pay to [S.D.] Twenty Thousand Dollars ($20,000.00) per month[;] ***

(b) The unallocated maintenance and child support payments by [N.D.] to [S.D.] pursuant to paragraph 3.4(a) above shall be reviewable after five (5) years;

* * *

3.7 If [N.D.] seeks a decrease in the support amount paid to [S.D.] by [N.D.], whether it be the child support element or the maintenance element of the unallocated support, prior to the completion of five (5) years of payments, and if [N.D.'s] petition is unsuccessful, he shall be responsible for the payment of one hundred percent (100%) of [S.D.'s] reasonable attorney's fees and costs.

If [S.D.] seeks an increase in the support amount paid by [N.D.] to [S.D.], whether it be the child support element or the maintenance element of the unallocated support, prior to the completion of five (5) years of payments, and if [S.D.'s] Petition is unsuccessful, she shall be responsible for the payment of one hundred percent (100%) of [N.D.'s] reasonable attorney's fees and costs."

¶ 6    On February 27, 2007, N.D. filed a petition to modify judgment. On July 19, 2007, the trial court issued an order finding a substantial change in circumstances meriting a decrease in unallocated support payments from $20,000 per month to $14,500 per month. The judgment further provided that the unallocated payments "shall be reviewable provided [S.D.] files a Petition within 30 days of the minor child's [Sa. D.'s] graduation from high school. Failure of [S.D.] to file such a petition timely, shall terminate any further maintenance obligations of [N.D.] to [S.D.]" The order further modified terms so that N.D. was responsible for 100% of Sa. D.'s boarding school expenses. Neither party appealed this order.

¶ 7        On June 17, 2008, S.D. filed a "Petition to Extend Maintenance." In the petition she alleged that Sa. D. was not attending high school, having withdrawn voluntarily "to avoid being expelled due to alleged misconduct." It further alleged that he was eligible to take the GED and could potentially earn his GED within 30 days of the filing of the petition. The petition sought an extension of maintenance "both temporarily and permanently." The petition also sought a modification of maintenance payments "so that [S.D.'s] after tax cash monthly flow is at least $35,000."

¶ 8        On August 29, 2008, N.D. filed a petition to modify support based on a substantial change in circumstances since the July 19, 2007 order, including Sa. D.'s emancipation, a substantial reduction in N.D.'s income, and S.D.'s rehabilitation and ability to obtain gainful employment. Although the trial court initially determined that it would only allow evidence gathered from the July 19, 2007 order to the present to show a substantial change in circumstances, it allowed S.D. to offer testimony and evidence relating to the standard of living she and N.D. enjoyed during their marriage. At a hearing on February 9, 2009, N.D.'s counsel made a request for a temporary reduction in support due to Sa. D.'s emancipation. The trial court reduced the monthly support payment from $14,500 to $12,000 per month, subject to reconsideration at the close of proofs.

¶ 9        Over eight days of hearings, conducted from February 9, 2009, to August 24, 2009, the parties presented witnesses and testified. S.D. presented vocational expert Deborah Gordon, who testified that the average income for all social workers in the area was $37,500 per year. She concluded, based on her research and the fact petitioner had a degree in social work from the University of Chicago, that S.D. potentially could earn between $18,000 and $44,000 per year.

¶ 10       S.D. also presented Cathy Belamonte Newman as a lifestyle expert. Belamonte testified that she gathered information and prepared a report showing "a numerical picture of *** what [S.D.'s] lifestyle would be like today had it remained the same as what she enjoyed during the marriage." She stated that she sought documentation from the current time period as well as from the period just preceding the divorce. Belamonte acknowledged that "the documentation that I was seeking to do that assignment the way that I would typically do it was not available. The records had been destroyed and *** I was not able to obtain them from [the attorneys'] office or from [S.D]." Instead, Belamonte interviewed petitioner and petitioner provided "a large amount of anecdotal information" including pictures from trips, travel documents, and invitations to social events.

¶ 11       S.D. testified that as part of the MSA, she received almost $1 million as her share of the marital estate, including the marital residence at 2503 Brookwood Drive in Flossmoor, Illinois, 50% of N.D.'s 401(k) plus an additional $100,000 from the 401(k), 50% of N.D.'s Lord Bissell and Brook pension, 50% of N.D.'s Wachovia individual retirement account (IRA), a 2001 BMW X5, and personal property including artwork valued at over $200,000. At the time she filed her petition, she had assets worth over $1 million.

¶ 12       S.D. also testified that she received a master's degree in social work from the University of Chicago in 2005 and was invited to join a practice in Frankfort, Illinois. She earned approximately $10,000 in income in 2007 and 2008 as an employee of Hoover Associates,

a group practice. Her employment ended on December 31, 2008, because of the present litigation and the inability to meet her employer's quota of seeing 11 patients a week. She is not currently working because to practice independently she needs to pass the licensed clinical social worker (LCSW) examination. She testified that she is eligible to take the examination. She acknowledged that the penalty clause of the MSA was negotiated by the parties to reduce the chance of future litigation.

¶ 13    S.D. testified to her health history, which includes having asthma and dealing with post-traumatic stress disorder as a result of a sexual assault. She also testified as to various physical ailments but admitted she did not take any prescription medications.

¶ 14    N.D. testified that he is a partner at Lock Lord Bissell & Liddell, LLP. He stated that his average income for 2006, 2007, and 2008 was $685,700, a 29.59% decrease from the income used to calculate support in the MSA. He also testified that his income for 2009 from January 1 through June 15 was $158,172 and he expected his total income for 2009 would further decrease. He confirmed that pursuant to the MSA he received a townhouse located at 205 Wysteria Drive in Flossmoor, Illinois, 50% of his Lord Bissell 401(k) minus $100,000, 50% of his Lord Bissell pension, 50% of his Wachovia IRA, and personal property. At the time he filed his petition, he had a net worth of approximately $220,000. His home had $50,000 of equity, and although he possessed retirement funds worth $470,000, he also carried $400,000 of debt. He disagreed with expenses included in Belamonte's cost analysis, arguing that almost all of the expenses listed were paid through his employment and not with marital funds.

¶ 15    Arlene Hirsch testified as a vocational expert for N.D. She stated that she prepared a report of her vocational assessment of S.D. She stated that S.D.'s goal was to have a part-time private practice in which she works out of her home and sees four or five clients. Hirsch discussed with her that this goal may be unrealistic given her lack of experience. She stated that S.D. did not want to participate in work with insurance or managed-care clients. Hirsch suggested that she first gain experience through employment with a third party. She further testified that a recent search of current licensed clinical social work jobs in Illinois ranged from $38,000 to $81,000 and S.D. was qualified for these positions. She concluded that S.D. could earn a mid-$50,000-per-year salary.

¶ 16    On June 3, 2010, the trial court issued an order granting N.D.'s petition and denying S.D.'s petition. It found that the parties entered the MSA freely and voluntarily and that they were represented by legal counsel throughout the proceedings. It also found reasonable the inference that "the parties considered all the relevant statutory factors in determining the appropriate unallocated maintenance obligation agreed to between the parties." Although S.D. filed a petition to extend maintenance, the trial court found that "[a] review of the record shows that not only is [she] seeking an extension of the current $14,500 per month unallocated support obligation, but [she] is requesting that [N.D.'s] obligation be increased by 175% of the $20,000" agreed to in the MSA and four times the $12,605 S.D. claimed she needed to support her lifestyle in 2004 according to her affidavit dated August 5, 2004. It found that her request for this sum to support her alone "ignores the fact that the Court found $14,500 monthly unallocated maintenance *** was sufficient to meet the reasonable financial needs of both" S.D. and her minor child. It noted that neither party appealed the

prior order and further found that "there is no credible evidence contained in the record of this cause which would justify anything remotely near what [S.D.] has requested." The court acknowledged that the July 19, 2007 order required petitioner to file a petition to review support upon [Sa. D.'s] graduation from high school, but the order did not condone a request to increase support "without having a factual basis for such a request."

¶ 17 The court also found that, regarding testimony about her lifestyle during the marriage, S.D. did not provide actual costs or adequately explain whether payment for activities had been made with marital funds or through respondent's employment. The court noted that S.D. "spent a considerable amount of trial time testifying as to the lifestyle the parties enjoyed during their marriage." However, most of her review regarding travel was limited to the year 1999. Also, some of her data included a planned trip to Paris that the parties never took. The trial court concluded that S.D.'s "testimony of her purported pre-decree lifestyle [was] not credible as it [was] based on incomplete, inaccurate and unreliable information. Additionally, her testimony is impeached by her representations pre-decree of her financial needs." The court also gave little weight to Belamonte's testimony since it was based on the same incomplete and unreliable information.

¶ 18 However, the court found vocational expert Gordon's testimony credible and concluded that based on her testimony S.D. should be able to obtain employment as a licensed social worker with a potential income of $37,500 per year. It found her failure to obtain her license evinced bad faith and she also did not make a good-faith effort to obtain full-time employment as a social worker. The court also found Hirsch credible and concurred with her opinion. The trial court found it "appropriate to impute the sum of $37,500.00 of annual income to [petitioner]."

¶ 19 The court also found that Sa. D. was emancipated, which was a substantial change in circumstances. It found N.D.'s income average over 2006, 2007 and 2008 represented a 24% decrease since entry of the unallocated support award. This decrease also represented a substantial change in circumstances. Taking into consideration the factors outlined in sections 504 and 510(a-5) of the Act, the court found "that an award [of] permanent maintenance is appropriate." It further found that $10,000 per month would meet S.D.'s reasonable monthly needs and also imputed the annual sum of $37,500 (or $3,125 per month) as "a reasonable sum [petitioner] could generate being employed as a LCSW." Therefore, N.D.'s permanent monthly maintenance obligation to S.D. would be $6,875 per month. The court applied the award retroactive to February 9, 2009. The court granted N.D.'s petition to modify but denied S.D.'s petition to extend maintenance where she "failed to establish any substantial change in circumstance to support her request for any increase in monthly maintenance from [N.D.]"

¶ 20 On August 10, 2010, the trial court issued rulings on the parties' cross-petitions for contribution to Sa. D.'s college expenses and petitioner's motion to reopen discovery. Pursuant to a stipulation, N.D. agreed to pay 100% of Sa. D.'s future college expenses as defined in the MSA. The trial court also granted S.D.'s request for reimbursement of $9,645.09, which the parties agreed petitioner had previously paid on Sa. D.'s behalf. The court denied S.D.'s motion to reopen discovery.

¶ 21    The parties also petitioned for attorney fees. The court found that N.D. was successful in his petition to decrease maintenance and S.D. was not successful in seeking an increase in maintenance. The parties agreed in paragraph 3.7 of their MSA that if S.D. sought an increase in support but was unsuccessful, she would be responsible for 100% of N.D.'s reasonable attorney fees and costs. The court determined that the provision should be enforced. Alternatively, the court found that N.D. is entitled to fees and costs pursuant to section 508(b) of the Act for having to defend S.D.'s petition to extend maintenance. It determined that S.D.'s request of a "400% increase in [N.D.'s] support obligation for [S.D.] alone" was based on "unreasonable and unconscionable" arguments, and her presentation of "testimony on a lifestyle during the marriage" which was not properly before the court was unnecessary and not credible. It found that the hearing on S.D.'s petition "was precipitated and conducted for an improper purpose *** [and] needlessly increase[d] the cost of litigation to both parties." The trial court ordered S.D. and her attorneys "to contribute equally all reasonable attorney fees and costs incurred by [N.D]. as a result of him having to defend against [S.D.'s] Petition to Extend Maintenance."

¶ 22    N.D. filed an amended petition for attorney fees and costs, requesting approximately $118,120.92. On October 14, 2010, the trial court granted his amended petition but reduced the award to $78,500. S.D. appeals the trial court's orders of June 3, 2010, August 10, 2010, and October 14, 2010.

¶ 23                                    ANALYSIS

¶ 24    First, S.D. contends that the trial court erroneously characterized her petition as a petition to modify support instead of a petition to review support. She argues the trial court therefore improperly required her to show a substantial change in circumstance when such a showing is necessary only if one seeks a modification in support. Where the MSA provides for unallocated maintenance and support that is "reviewable" after a period of years, the parties have agreed to a general review of maintenance. *Blum v. Koster*, 235 Ill. 2d 21, 35 (2009). A general review of maintenance does not require the moving party to prove a substantial change in circumstances. *Id.* at 35-36. Instead, the trial court considers the factors set forth in sections 504(a) and 510(a-5) of the Act and determines whether "to continue maintenance without modification, to modify or terminate maintenance, or to change the maintenance payment terms." *Id.* at 36.

¶ 25    The MSA at issue here provided that unallocated maintenance and child support payments "shall be reviewable after five (5) years." The July 19, 2007, order in which the trial court decreased the support payments from $20,000 per month to $14,500 per month also provided that the payments "shall be reviewable provided [petitioner] files a Petition within 30 days of the minor child's [Sa. D.'s] graduation from high school." Although her petition requests an increase in maintenance, it specifically refers to the July 19, 2007, order which provides for general review. Furthermore, a request to increase maintenance can coincide with a general review since a modification of maintenance is an option available to the court in a review of maintenance. *In re Marriage of Golden*, 358 Ill. App. 3d 464, 471 (2005). We find that the petition to extend maintenance sought a general review of

maintenance, and therefore petitioner was not required to prove a substantial change in circumstances.

¶ 26 The trial court below stated in its order that S.D. as the moving party must demonstrate "a substantial change in circumstances to warrant the relief sought." However, a review of the court's detailed order and its reasoning reveals that it simply considered the factors listed in sections 504(a) and 510(a-5) of the Act in light of the evidence presented by the parties at the hearings. To uphold a trial court's maintenance determination pursuant to a general review, we must find that "the trial court considered the enumerated statutory factors and that the record supports its decision." *Blum*, 235 Ill. 2d at 38. Therefore, any error that may have occurred was harmless given the fact that the trial court utilized the same analytic process it would have used pursuant to a general review.

¶ 27 S.D. next contends that the trial court erred in denying her request for an increase in maintenance, and granting N.D.'s petition to decrease maintenance. Section 504(a) of the Act lists relevant factors to consider in determining maintenance, including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2006).

¶ 28 When determining whether to modify a maintenance award, courts consider the following factors in addition to the factors listed in section 504(a) above:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-

supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease of each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/510(a-5) (West 2010).

¶ 29      Where the record establishes the basis for a maintenance award, the trial court need not make explicit findings for each of the statutory factors. *Blum*, 235 Ill. 2d at 38. This court will not disturb the trial court's decision to modify maintenance upon conducting a review of maintenance absent a clear abuse of discretion. *Id*. The trial court abuses its discretion when its "ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).[1]

¶ 30      S.D. requested an increase in maintenance to $35,000 per month in pretax dollars. The trial court stated throughout its order that it considered the factors listed in sections 504(a) and 510(a-5). It noted that during the hearings on the parties' petitions, S.D.'s evidence consisted mostly of her predissolution lifestyle and travel, with the main focus on the year 1999. The trial court found most of this evidence, presented through lifestyle expert Belamonte, not credible as it was based on incomplete and unreliable information. However, it found credible the testimony of the parties' vocational experts, both of whom concluded that S.D. was qualified to take the licensing examination and could find employment as a licensed social worker. Although S.D. testified as to various physical ailments, there was no indication that she could not find work and support herself. In fact, she had been employed in a group practice prior to this litigation. It found that her present unemployment and her delay in taking the licensing examination evidenced bad faith on S.D.'s part. The trial court therefore imputed a yearly income of $37,500 to her. The court also found that S.D. had

[1]S.D. contends that *de novo* review is appropriate because the trial court should have utilized a *de novo* review of the statutory factors to determine the proper amount of maintenance, but erred because it used "an abuse of discretion standard." S.D.'s argument appears to confuse to which court the standard of review applies. Instead, the relevant standard of review is what this court uses to review the trial court's determination and address the parties' issues on appeal.

assets worth in excess of $1 million including the marital home.

¶ 31 The court further found that N.D.'s income had decreased by about 24%, and the parties' youngest child, Sa. D., was emancipated. Pursuant to a subsequent agreement, N.D. is now responsible for 100% of Sa. D.'s college expenses. In light of the fact that $14,500 per month was found to meet S.D.'s needs before Sa. D.'s emancipation, the trial court determined that $10,000 per month was a reasonable sum to meet S.D.'s present needs. It also reduced the amount by $3,125 per month to reflect the income imputed to her. Therefore, N.D.'s monthly obligation to S.D. would be $6,875. Although the court found that S.D. was rehabilitated, it acknowledged that N.D. "will always have a greater earning ability than" petitioner. Considering the statutory factors, the trial court determined "that an award [of] permanent maintenance is appropriate." The trial court did not abuse its discretion in awarding S.D. $6,875 per-month-permanent maintenance.

¶ 32 S.D. disagrees, arguing that (1) the trial court's findings regarding the parties' change in financial circumstances since the 2007 order was against the manifest weight of the evidence; (2) the trial court erred in imputing $37,500 yearly income to S.D.; (3) the trial court erroneously gave little or no weight to S.D.'s standard of living evidence and to Belamonte's testimony; (4) the trial court's use of income averaging to determine N.D.'s income was error; and (5) the trial court failed to give proper weight to N.D.'s ability to pay both for S.D.'s needs as well as his own.[2]

¶ 33 S.D. first argues that the trial court's findings regarding her financial situation after the July 19, 2007, order was error. She contends that her needs in supporting Sa. D. actually increased because in 2007, when the trial court modified unallocated support for her and Sa. D. to $14,500 per month, Sa. D. was in boarding school at little expense to her. Now she claims she must pay one-third of Sa. D.'s college expenses. Furthermore, in 2007 she was employed by Hoover and earned an income whereas now she is unemployed. We are not persuaded by S.D.'s argument. Pursuant to a subsequent agreement by the parties, N.D. is now responsible for 100% of Sa. D.'s college expenses. Also, the credible testimony of the parties' vocational experts indicates that S.D. could immediately find employment as a social worker in a group practice. However, she has chosen to wait and take her licensing examination in an attempt to establish a private practice, an endeavor Hirsch acknowledged would be challenging without more experience.

¶ 34 S.D. also argues that the trial court improperly counted Sa. D.'s emancipation as a factor in decreasing the amount of support in 2007, and again in the June 3, 2010 order. She contends Sa. D. was *de facto* emancipated in 2007 because he was in boarding school and living away from the parties. The trial court made no such finding in 2007. In any event, under the terms of the parties' MSA Sa. D. was not considered emancipated. The MSA is a

_____

[2]Throughout S.D.'s 100-page brief are intermittent and bare contentions with little argument and/or no citation to legal authority in violation of Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). We will address issues that are clearly defined and supported by pertinent authority. However, we need not consider those contentions that do not meet the requirements of Rule 341(h)(7).

contract and the terms of the agreement are binding on the parties and the courts. *Blum*, 235 Ill. 2d at 32. Section 3.2 of the MSA defines emancipation as an event occurring upon the child reaching the age of 18 or his graduation from high school, whichever occurs later, or "[t]he child's having a permanent residence away from the permanent residence of [S.D.] A resident at boarding school *** is not deemed a residence away from the permanent residence of [S.D.]" The fact Sa. D. was away at boarding school in 2007 did not emancipate him under the terms of the MSA.

¶ 35    S.D. also argues that the trial court improperly imputed $37,500 yearly income to her when it determined the amount of maintenance she should receive. Under the MSA, S.D.'s unallocated support and maintenance was to continue for five years, after which time both children would be emancipated. Furthermore, the agreement provided that support and maintenance would be reviewable at that time. Although the agreement did not refer to S.D.'s maintenance as rehabilitative, the provisions of the agreement when viewed together suggest such an intent by the parties. See *Blum*, 235 Ill. 2d at 35. Rehabilitative maintenance provides a spouse with an opportunity to adjust to life after a divorce and become self-sufficient. *In re Marriage of Carpel*, 232 Ill. App. 3d 806, 828 (1992).

¶ 36    The evidence shows that S.D. received a master's degree in social work from the University of Chicago and found employment with a group practice in which she earned approximately $10,000 in income in 2007 and 2008. Her employment ended on December 31, 2008, because of the present litigation and the inability to meet her quota of seeing 11 patients a week. She stated she is not currently working because to practice independently she needs to pass the LCSW examination. Arlene Hirsch testified that S.D.'s goal was to have a part-time private practice in which she works out of her home and sees four or five clients. Hirsch discussed with her that this goal may be unrealistic given her lack of experience and suggested that S.D. first gain experience through employment with a third party. Hirsch further testified that a recent search of current licensed clinical social work jobs in Illinois ranged from $38,000 to $81,000 and S.D. was qualified for these positions. She concluded that S.D. could earn a mid-$50,000 per year salary. S.D.'s vocational expert Deborah Gordon testified that the average income for all social workers in the area was $37,500 per year. She also concluded that S.D. potentially could earn between $18,000 and $44,000 per year.

¶ 37    The trial court found vocational expert Gordon's testimony credible and concluded that based on her testimony S.D. should be able to obtain employment as a licensed social worker with a potential income of $37,500 per year. It found her failure to obtain her license evinced bad faith and that S.D. also did not make a good-faith effort to obtain full-time employment as a social worker. The court found Hirsch credible and concurred with her opinion. The trial court's decision to impute $37,500 of annual income to S.D. was not an abuse of discretion. See *Blum*, 235 Ill. 2d at 41(although spouse was not presently working as an attorney, the court found her steps toward financial independence "minimal" although her future earning potential as an attorney was promising, warranting a reduction in the maintenance amount).

¶ 38    S.D. next contends that the trial court erroneously determined that $10,000 would meet her needs, giving little or no weight to standard of living evidence she presented. The amount of maintenance awarded by the trial court is within its sound discretion and a reviewing court

will not overturn that determination absent an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). An abuse of discretion occurs where no reasonable person would adopt the trial court's position. *Id.*

¶ 39 The trial court, in its lengthy order, stated that it considered the statutory factors, including the provisions of the MSA, the age and health of the parties, the fact S.D. served as primary caregiver to the parties' children during the marriage, S.D.'s ability and motivation to find gainful employment, N.D.'s employment, property received by the parties pursuant to the MSA, and testimony of witnesses in determining that $10,000 per month should meet S.D.'s needs. It also found incredible S.D.'s testimony regarding the parties' lifestyle during the marriage and her request for $35,000 after taxes per month to meet her needs. The trial court believed her testimony was impeached by a prior affidavit signed in 2005 by S.D. stating she needed approximately $12,000 per month in support, with one minor child, as well as the parties' July 19, 2007 order, which determined the appropriate amount of support to be $14,500 with Sa. D. at boarding school. Neither party appealed the 2007 order. The trial court did not abuse its discretion in awarding $10,000-per-month maintenance to S.D.

¶ 40 S.D. argues that the $10,000 does not accurately reflect the standard of living she enjoyed during the marriage because the trial court improperly gave little or no weight to the evidence she presented. She contends the trial court should have found her testimony and that of lifestyle expert Bellamonte credible because she provided various documents to support their positions. "[I]t is well established that the credibility of the witnesses and weight to be given to their testimony is for the trier of fact to decide, and a reviewing court may not substitute its judgment for that of the fact finder." *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 199 (2011). The trial court stated its reasons why it found S.D.'s evidence not credible and we find no abuse of discretion.

¶ 41 S.D. also argues that the trial court erred in applying the doctrine of *res judicata* to the present proceeding and allowing only evidence of changed circumstances that occurred after the last modification (the July 2007 order). A maintenance award is *res judicata* as to facts at the time the award was entered. *In re Marriage of Connors*, 303 Ill. App. 3d 219, 226 (1999). In modification proceedings, the court allows the parties to present only evidence from the latest petition onward so as to avoid relitigation of issues already settled. *In re Marriage of Pedersen*, 237 Ill. App. 3d 952, 957 (1992).

¶ 42 The trial court took judicial notice of the parties' MSA and the July 2007 order, and the fact that both necessarily took into account the parties' standard of living during the marriage. The trial court did not err in stating that evidence of the parties' lifestyle during the marriage was *res judicata*. Notwithstanding, upon S.D.'s attorney's insistence, the trial court did allow S.D. to testify as to the standard of living she enjoyed during the marriage and to present the testimony of Belamonte, although it concluded that it did not find her testimony credible. We find no error here.

¶ 43 Next S.D. contends that the trial court's averaging of N.D.'s income for the years 2006, 2007, and 2008 was error because although his income decreased from 2006 to 2007, it rose from 2006 to 2008. She argues that the income data did not show a "definitive pattern of

economic reversal" justifying the use of income averaging. As support, she cites *In re Marriage of Schroeder*, 215 Ill. App. 3d 156 (1991). However, the trial court in that case averaged six years of income and the appellate court determined that some of the data was too old and unreliable. *Id.* at 161. It concluded that income averaging should only be used if a "definitive pattern of economic reversals" over several years is shown. *Id.* Also, the trial court here used data accepted by both parties for the past three years only. In *In re Marriage of Elies*, 248 Ill. App. 3d 1052, 1060-61 (1993), the First District Appellate Court found that using the income average from the past three years was an appropriate method for determining available income for maintenance and support. Furthermore, it disagreed with *Schroeder*'s conclusion that income averaging should only be used if a definitive pattern of economic reversals over several years is shown. *Id.* We choose to follow *Elies* and find that the trial court did not err in utilizing income averaging to determine N.D.'s available income for maintenance.

¶ 44    S.D. also argues that N.D. should contribute more maintenance because his income allows him to do so and still maintain a reasonable standard of living for himself. As support, she cites *In re Marriage of Reynard*, 344 Ill. App. 3d 785 (2003), and *In re Marriage of Simmons*, 87 Ill. App. 3d 651 (1980). Neither case, however, stands for the proposition that a party must pay more maintenance merely because he has the ability to do so. Instead, the trial court must consider the factors outlined in sections 504(a) and 510(a-5), and award an increase or decrease in maintenance only where "the needs of the spouse receiving alimony change or the ability of the other spouse to pay alimony changes." *Shive v. Shive*, 57 Ill. App. 3d 754, 760 (1978). The trial court found that S.D.'s needs did not increase substantially but, rather, decreased given the emancipation of Sa. D. It further found that N.D.'s income had decreased by 24%. The trial court did not abuse its discretion by decreasing S.D.'s maintenance to $10,000 per month rather than grant her request to increase her support to $35,000 per month. See *In re Marriage of Lasota*, 125 Ill. App. 3d 37, 42 (1984) (recipient of maintenance not entitled to an increased amount solely on the basis that the payor's income has substantially increased).

¶ 45    S.D.'s next contention is that the trial court erred in determining that the decreased maintenance award is retroactive to February 9, 2009, making her responsible for payment to N.D. of $76,875. A trial court's decision to make payments retroactive is reviewed under an abuse of discretion standard. *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 233 (2008).

¶ 46    Section 510(a) of the Act provides:

"[T]he provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to due notice by the moving party of the filing of the motion for modification." 750 ILCS 5/510(a) (West 2006).

Pursuant to the statute, "the earliest point to which retroactive modification of maintenance or support payments may be ordered is the date on which the nonmoving party receives 'due notice' from the moving party of the filing of the modification petition." *In re Marriage of Hawking*, 240 Ill. App. 3d 419, 426 (1992). N.D. filed his petition to modify support on August 29, 2008. This gave due notice to S.D. that he was seeking modification of support.

Therefore, the trial court could have ordered the decreased payment retroactive to August 29, 2008, but instead made such payment retroactive to February 9, 2009, at which point S.D. was well aware of N.D.'s intent to modify his payment. The trial court did not abuse its discretion.

¶ 47        S.D. contends, however, that pursuant to the MSA she is entitled to unallocated maintenance and support to 2010, and the trial court's decision to make the decreased payment retroactive to 2009 deprived her of her contractual rights. S.D. and N.D. agreed to terms of maintenance and support in their MSA. A marital settlement agreement is a contract and the terms contained therein are binding on the parties and the court. *Blum*, 235 Ill. 2d at 32-33. "A marital settlement agreement is construed in the manner of any other contract, and the court must ascertain the parties' intent from the language of the agreement." *Id.* at 33.

¶ 48        Although the MSA did provide payments to 2010, nothing in the agreement barred the parties from seeking modification of the payment terms before 2010. N.D. filed a petition to modify on February 27, 2007, and the trial court in its July 19, 2007, order modified the maintenance and support terms of the MSA. The order reduced payments to $14,500 per month and the award was reviewable provided S.D. filed a petition within 30 days of Sa. D.'s graduation from high school in 2008. Neither party appealed the order. S.D. filed her petition to extend maintenance on June 17, 2008, and N.D. filed his petition to modify on August 29, 2008. The trial court's subsequent order making the decreased payments retroactive to February 9, 2009, did not contradict the clear terms of the MSA.

¶ 49        S.D. next contends that the trial court erred in assessing $78,500 in attorney fees against her pursuant to section 3.7 of the MSA. She argues that the trial court's July 19, 2007, order improperly imposed a new penalty clause on the MSA when it *sua sponte* required S.D. to seek review of her unallocated maintenance and support payments at Sa. D.'s emancipation in 2008, instead of the 2010 date contained in the original agreement. She argues that the trial court's error rendered section 3.7 invalid and inapplicable since it no longer reflected the intent of the parties when they signed the original agreement. This issue arises from the trial court's 2007 order. As discussed above, neither S.D. nor N.D. appealed that order. Questions that could have been raised in a prior appeal on the merits are waived for review on a subsequent appeal. *McDunn v. Williams*, 156 Ill. 2d 288, 334 (1993).

¶ 50        S.D. contends that the trial court also erred in applying section 3.7 of the MSA because the clause is against public policy. She claims that the clause improperly orders the unsuccessful party to pay the fees of the successful party without regard to the parties' ability to pay. The cases she cites in support, however, *In re Marriage of McCaskey*, 167 Ill. App. 3d 860 (1988), and *Coons v. Wilder*, 93 Ill. App. 3d 127 (1981), do not involve an attorneys fees provision contained in a settlement agreement as we have here. Generally, a settlement agreement is not subject to appellate review because it " 'is a recordation of the agreement between the parties and *** not a judicial determination of the parties' rights.' " *In re Marriage of Gibson-Terry*, 325 Ill. App. 3d 317, 325 (2001) (quoting *In re Haber*, 99 Ill. App. 3d 306, 309 (1981)). However, a court may set aside a settlement agreement if it was obtained through coercion, duress, or fraud, or if the agreement is unconscionable. *Id.* There is nothing inherently unconscionable about a provision in a contract awarding attorney fees to the prevailing party. S.D. does not argue that she was coerced into signing the MSA;

rather, the MSA specifically states that "the parties do freely and voluntarily agree" to the terms of the MSA. See *id.* at 328.

¶ 51    S.D. also argues that the clause is unconscionable because it penalizes her for seeking review of her maintenance when she is under court order to seek such review. However, as discussed above S.D. did not merely seek to extend her existing maintenance and support but sought an increase in the amount of support. If she had petitioned for an extension of payments, without seeking an increase in the amount of support, she would not have triggered section 3.7. Section 3.7 comes into play only when "[S.D.] seeks an increase in the support amount paid by [N.D.] to [S.D.]" We are not persuaded by her contentions and find section 3.7 of the MSA valid and enforceable.

¶ 52    S.D. next contends that section 3.7 does not apply because she actually prevailed in obtaining an increase in maintenance, and the trial court made the award permanent. Section 3.7 states that if S.D. is unsuccessful in seeking "an increase in the support amount paid by [N.D.]" she is responsible for 100% of his reasonable attorney fees and costs. She claims that because the MSA called for $20,000 per month (later modified to $14,500) unallocated maintenance and support, there was no specific amount of maintenance and the approximately $6,800 per month awarded could very well represent an increase. However, we cannot reliably determine what percentage of the unallocated support applied to maintenance only. See *In re Marriage of Ferraro*, 211 Ill. App. 3d 797, 800 (1991) (when a child is emancipated, unallocated support is not necessarily reduced *pro rata*, but rather the decreased amount "is a matter solely for judicial determination"). The $14,500 amount determined by the trial court in its 2007 order provided support for both S.D. and Sa. D. while he was in boarding school and prior to his emancipation. We can only ascertain that upon Sa. D.'s emancipation, the amount of maintenance required for S.D. alone should be less than $14,500. Furthermore, in her petition S.D. sought $35,000 per month in maintenance, which is an increase from $14,500 and even from the original amount of $20,000 per month in unallocated maintenance and support. She sought $35,000 but was unsuccessful. According to the clear language of the MSA, section 3.7 applies and N.D. is entitled to the fees pursuant to the MSA.[3]

¶ 53    S.D. next contends that the trial court erred in assessing attorney fees against her in the amount of $78,500. In her brief, S.D. lists eight instances where the trial court allegedly erred in allowing fees, most of which she supports with little argument and little or no citation to authority in violation of Rule 341(h)(7). However, waiver is a limitation on the parties only and this court may decide an issue if it is sufficiently supported by the record. *Ward v. Community Unit School District No. 220*, 243 Ill. App. 3d 968, 974-75 (1993). We find that the trial court's detailed October 14, 2010 order and the record are sufficient to address the issue. In determining the reasonableness of attorney fees courts consider the skill and standing of the attorney, the nature of the case, the degree of responsibility required, the usual

---

[3]The trial court alternatively found that N.D. was entitled to attorney fees under section 508(b) of the Act. Due to our disposition of the issue, we need not consider whether the trial court properly awarded N.D. attorney fees under that section.

-15-

and customary charges for services and a reasonable connection between the fees and the litigation. *Baez v. Rosenberg*, 409 Ill. App. 3d 525, 535 (2011). The amount of attorney fees awarded is within the sound discretion of the trial court and a reviewing court will not disturb that determination absent an abuse of discretion. *Pitts v. Holt*, 304 Ill. App. 3d 871, 872 (1999).

¶ 54    In its order, the trial court noted that N.D.'s counsel submitted itemized billing statements to support their request for fees in the amount of $118,128.92. The court reviewed the statements and considered arguments by S.D.'s counsel regarding hearsay in their objection to admission of the statements. It found that a proper foundation had been established to admit the documents as a business record exception to the hearsay rule and it denied counsel's objection. The trial court also "considered [S.D.'s] argument that no time should be considered for time spent regarding the preparation and presentation of closing arguments" and her "arguments and objections distinguishing a petition brought to extend maintenance which [she] argues would have required attorney fees anyway versus a petition to increase maintenance. The Court also considered [S.D.'s] arguments that no entries for cab fare between her attorneys' office and the Richard J. Daley Center should be considered, and also considered [S.D.'s] argument that it was [N.D.] who had asked the Court to consider the standard of living during the parties' marriage."

¶ 55    Furthermore, the trial court explicitly stated that it considered the factors required to determine the reasonableness of attorney fees. It found N.D. to be a more credible witness than S.D., and noted that S.D.'s insistence on presenting evidence of lifestyle prior to dissolution, "even though that issue was previously addressed by agreement of the parties' in their Marital Settlement Agreement," increased the "time, cost, and difficulty of this litigation." It also found that S.D.'s request for an increase in monthly support to $35,000 "in post tax dollars virtually eliminated any possibility of negotiation between the parties to resolve this matter in a reasonable fashion and only assured that the matter would be tried in a full evidentiary hearing." Taking all of these elements into consideration, the trial court found $78,500 a reasonable sum for an award of attorney fees to N.D. even though his counsel had requested $118,128.92. After careful review of the record, we find no abuse of discretion here.

¶ 56    S.D.'s final argument is that the effect of the decreased maintenance, the retroactive judgment against her, and the assessment of $78,500 of N.D.'s attorney fees and costs will force her to liquidate her assets in order to satisfy the judgments and support herself. She contends that the $6,875 per month awarded to her covers only 42% of her actual monthly expenses and that she has had to take out a line of credit against her house to pay legal fees accrued during prejudgment proceedings. However, the cases she cites in support, *In re Marriage of Emery*, 179 Ill. App. 3d 744 (1989), *Head v. Head*, 168 Ill. App. 3d 697 (1988), and *In re Marriage of Dodge*, 184 Ill. App. 3d 495 (1989), involve a request that an ex-spouse liquidate her assets to generate support in lieu of receiving maintenance payments. Here, there is no requirement that S.D. liquidate her assets instead of receiving maintenance from N.D. Instead, S.D. was awarded permanent maintenance.

¶ 57    Initially we must note that S.D. agreed to the provision in the MSA relating to attorney fees. She was well represented by counsel and cannot now complain of the effect of that

provision. The parties understood that litigation associated with modification petitions and reviews is costly, and she acknowledged that the attorney fee provision was their attempt to avoid unnecessary litigation. Although S.D. was required by the 2007 order to petition the court for review of her support, as the trial court stated the order did not condone her request to increase support "without having a factual basis for such a request." S.D. requested an increase of support to $35,000 per month based on testimony and evidence the trial court subsequently found not to be credible. Although the trial court tried to dissuade her from presenting evidence of her lifestyle during the marriage, it eventually allowed the testimony at the insistence of S.D.'s counsel. This testimony represented the bulk of S.D.'s evidence and contributed to the attorney fees incurred by her and by N.D.

¶ 58       Furthermore, although a former spouse is not required to liquidate assets in order to generate sufficient income on which to support herself, she also has "a good-faith obligation to become self-sufficient." *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 306 (2005). The $6,875 monthly amount is based on S.D.'s ability to obtain gainful employment as a licensed social worker. The trial court found that she has not in good faith attempted to find work and she remains unemployed. Gordon and Hirsch testified that social work positions are available and that S.D. is qualified for those positions. S.D. could alleviate some of her debt by earning income as a social worker. We find that the trial court's judgment did not improperly require S.D. to liquidate her assets in order to satisfy the judgments against her and support herself.

¶ 59       For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 60       Affirmed.