2020 IL App (2d) 190232-U
No. 2-19-0232
Order filed May 12, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| SUSAN COATES, | ) | of Du Page County. |
| | ) | |
|     Petitioner-Appellee and | ) | |
|     Cross-Appellant, | ) | |
| | ) | |
| and | ) | No.  13-D-2410 |
| | ) | |
| ROBERT K. COATES, | ) | |
| | ) | Honorable |
|     Respondent-Appellant and | ) | Michael W. Reidy, |
|     Cross-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Birkett and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not improperly consider evidence predating the last modification order in assessing whether wife established a substantial change in circumstances that would warrant a modification of maintenance; (2) the trial court's finding that wife established a substantial change in circumstances since last maintenance modification order was not against the manifest weight of the evidence; (3) the trial court's decision to modify wife's maintenance award did not constitute an abuse of discretion; (4) although the trial court did not consider all sources of income in calculating modified maintenance award, amount did not constitute an abuse of discretion; and (5) the trial court did not abuse its discretion in awarding wife attorney fees in connection with her petition for adjudication of indirect civil contempt.

¶ 2                                    I. INTRODUCTION

¶ 3      Respondent, Robert K. Coates, appeals from an order of the circuit court of Du Page County (1) increasing the monthly maintenance awarded to petitioner, Susan Coates, and (2) directing him to pay $2000 in attorney fees pursuant to section 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(b) (West 2016)) in connection with Susan's petition for adjudication of indirect civil contempt. On appeal, Robert argues that, for various reasons, the trial court erred in increasing his monthly maintenance obligation from $2500 per month to over $12,000 per month. Robert also contends that the trial court erred in awarding attorney fees in connection with Susan's petition for adjudication of indirect civil contempt. In addition to Robert's appeal, Susan has filed a cross appeal, arguing that the trial court erred in its calculation of Robert's income in setting the maintenance amount. For the reasons set forth below, we affirm.

¶ 4                                   II.  BACKGROUND

¶ 5                              A. Dissolution Proceedings

¶ 6      The parties were married on August 8, 1998. Three children were born to the parties during the marriage, twins L.C. and D.C. (born May 23, 2001) and B.C. (born April 18, 2004). On November 15, 2013, Susan filed a petition for dissolution of marriage. Later that same month, Robert filed a counter-petition for dissolution of marriage. On January 23, 2014, the trial court entered a final custody judgment that incorporated the parties' joint parenting agreement. Pursuant to the joint parenting agreement, the parties shared joint custody with the children residing primarily with Susan subject to extensive and liberal parenting time for Robert.

¶ 7      On June 24, 2015, the trial court entered a judgment of dissolution of marriage that incorporated the parties' marital settlement agreement (MSA). The MSA recognized that, at the

time of its entry, Susan was unemployed and Robert had been terminated from his employment with RSW Investments, LLC (RSW). The MSA required Robert to pay Susan unallocated family support of $5583 per month beginning July 1, 2015. The MSA divided the marital estate equally, with each party receiving approximately $2 million exclusive of the marital interest in two entities—RSW and Bellvale, LLC (Bellvale). As to RSW, the parties agreed to equally divide the net proceeds of sale of Robert's interest in the entity. As to Bellvale, Robert agreed to pay Susan $562,086 for her marital interest in the entity. This amount represented 50% of Robert's ending capital account in Bellvale less applicable taxes. Susan retained the marital residence located on Greenlake Drive in Aurora (Greenlake residence) while Robert retained property located on Main Street in Naperville (Naperville residence). The MSA also required each party (1) to provide the other party a copy of his or her federal and state income tax returns by May 1st of each year with the parties' obligation to do so terminating when Robert "no longer has an obligation to pay either child support or maintenance" and (2) to inform the other "within seven (7) days of any change in his or her employment status including the name of his or her new employer and initial compensation."

¶ 8    As provided for in the joint parenting agreement, the children resided primarily with Susan after the divorce. Robert had parenting time every other weekend and every Wednesday overnight. This arrangement continued until May 2016 when primary residential care of the children was transferred to Robert after Susan, without notice to Robert, "departed her residence and left the children in the care of third parties." On June 4, 2016, Susan attempted suicide and was subsequently hospitalized.

¶ 9                          B. July 19, 2016, Order

¶ 10    On July 19, 2016, the parties executed an agreed order providing Robert with primary

residential care of the children subject to reasonable parenting time for Susan. The agreed order terminated Robert's obligation to pay $5583 in monthly unallocated family support effective May 20, 2016, but required Robert to pay Susan $2500 per month as maintenance. The agreed order did not specify how the maintenance amount was calculated, but provided that it "shall be modifiable based upon a substantial change in circumstances pursuant to section 510 of the *** Act [750 ILCS 5/510 (West 2016)] and shall be reviewable as of June 24, 2028, upon petition filed by either [party]." As to Susan's obligation to contribute to the support of the parties' children, the agreed order provided that Susan's child-support obligation had been considered in setting the maintenance award and that Susan shall have no obligation to pay child support to Robert. Nonetheless, the agreed order required each party to pay "one-half of the expenses incurred incident to [the] extracurricular activities of a child on which the parties agree."

¶ 11                 C. Susan's Petition for Adjudication of Indirect Civil Contempt

¶ 12     On December 8, 2017, Susan filed a "Petition for Adjudication of Indirect Civil Contempt and Reasonable Attorney's Fees" (Contempt Petition). Count I of the Contempt Petition alleged that the MSA required each party to turn over his or her federal and state income tax returns to the other party by May 1 each year, that Susan had made a demand upon Robert for compliance with the provision, and that Robert had "willfully refused and failed to comply with the terms of the [MSA]." Count II of the Contempt Petition alleged that the MSA required each party to keep the other apprised of his or her employment status (as both parties were unemployed when the trial court entered the judgment of dissolution), Susan had made a demand upon Robert for compliance with the provision, and Robert had "willfully refused and failed to comply with the terms of the [MSA]." Susan requested entry of an order for a rule to show cause, an order requiring Robert to comply with the marital settlement agreement, and an order requiring Robert to pay all reasonable

attorney fees, court costs, and expenses she incurred in presenting the petition.

¶ 13    Robert filed a motion for involuntary dismissal pursuant to sections 2-615 and 2-619(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2-615, 2-619(a)(9) (West 2016)) of Susan's Contempt Petition. Regarding count I, Robert argued that the MSA did not require him to turn over his tax returns since he no longer had an obligation to pay child support to Susan following entry of the July 19, 2016, agreed order. As to count II, Robert argued that Susan failed to allege that he had become employed and therefore failed to state a cause of action for an adjudication of indirect civil contempt based on a failure to inform Susan of a change in his employment status. On January 9, 2018, the trial court, Judge Neal Cerne presiding, entered an order denying Robert's motion to dismiss count I but granting Robert's motion to dismiss count II "without prejudice to [Susan's] right to allege new employment of [Robert]." Susan did not refile count II.

¶ 14                    D. Susan's Petition to Modify Maintenance

¶ 15    On December 22, 2017, Susan filed a "Petition to Modify (Increase) Maintenance" (Modification Petition). In the Modification Petition, Susan alleged that a substantial change in circumstances had occurred "since the entry of the Judgment of Dissolution of Marriage and [the] July 19, 2016 Order." Specifically, Susan claimed that Robert's income had increased and her personal, household, and family expenses had "increased substantially since the entry of the Judgment of Dissolution of Marriage and [the] July 19, 2016 Order." As such, Susan requested an increase in maintenance.

¶ 16    On January 16, 2018, Robert filed a "Motion to Strike" certain portions of Susan's Modification Petition. Robert alleged as follows:

     "[T]he obligation which [Susan] seeks to modify was established by virtue of the order of

     July 19, 2016. That the issue on a petition for modification is whether there has been a

substantial change in circumstances since the previous order. [Citation.] That the circumstances existing as of that date of the July 19, 2016 order are relevant and material. That the circumstances existing at the time of the judgment of dissolution of marriage, some 13 months prior to the July 19, 2016 order are neither relevant nor material."

On February 13, 2018, Judge Cerne granted Robert's motion and struck from Susan's Modification Petition "the allegations concerning the circumstances as of the date of the judgment of dissolution of marriage."

¶ 17                     E. Robert's Counter-Petition for Child Support

¶ 18    On March 7, 2018, Robert filed a "Counter-Petition for Child Support Award." Robert alleged a substantial change in circumstances since entry of the July 19, 2016, agreed order in that the children had become older, their interests and corresponding needs had increased, the costs of providing for them had increased, and Susan had become employed and was able to contribute to the children's support. In her response, Susan admitted that she had become employed, but denied the remaining allegations.

¶ 19                                F. Trial

¶ 20    A trial on Susan's Modification Petition, Susan's Contempt Petition, and Robert's counter-petition for child support was held between January 22 and January 24, 2019. By the time of trial, the case had been reassigned to Judge Michael Reidy, who was informed at the commencement of the trial about Judge Cerne's order granting Robert's motion to strike the allegations in Susan's Modification Petition concerning the circumstances as of the date of the judgment of dissolution of marriage. In her opening statement, Susan requested that her maintenance obligation be increased from $2500 per month to $25,000 per month based on "a cap" of Robert's income at $1 million per year. The following testimony was then presented at the hearing.

¶ 21                           1. Robert's Testimony

¶ 22    Robert testified that since 2015, he has resided in a townhome located on Townes Circle in Aurora (Townes Circle residence). The fair market value of the Townes Circle residence is $265,000. In January 2018, Robert purchased a 3000-square-foot single-family residence located on Inverness Avenue in Aurora (Inverness residence). Title to the Inverness residence is held jointly by Robert and his fiancé, Heather Jordan. Jordan and her children reside in the Inverness residence. Robert paid $397,000 cash for the Inverness residence and spent at least $175,000 remodeling the home upon purchase. At the time of the dissolution of marriage, Robert also owned the Naperville residence. Robert sold the Naperville residence for $1.35 million in spring 2018. Prior to its sale, Jordan and her children resided in the Naperville residence, paying rent of $1500 per month.

¶ 23    Robert holds a finance degree from Indiana University as well as degrees in finance and technology from Northwestern University. Robert's most recent employment was with RSW, where he worked from 2009 through 2015. Robert was a partner at RSW and also worked full time as a portfolio manager, managing clients' money. Robert received two streams of income from RSW, a salary as an employee and a percentage of the profits as an owner. Robert also received bonuses from RSW and was reimbursed for certain expenses. Robert testified that his salary as an employee was approximately $175,000 per year in each of the last two years he worked for RSW. Robert earned a bonus of $50,000 from RSW in 2013 and $20,000 in 2014. Robert separated from RSW on April 30, 2015, less than two months before entry of the judgment of dissolution of marriage. Upon his separation from RSW, Robert began receiving 26 weeks of severance pay and 13 weeks of paid health insurance. In addition, Robert was also to receive a membership-interest payment upon the 12-month anniversary of his separation from RSW.

¶ 24    Robert's partner at RSW was Robert Waas (Waas). While employed at RSW, Robert and Waas formed and operated a separate entity, Bellvale, where Robert and Waas managed their own money. The primary vehicle traded with Bellvale was municipal bonds, and Robert physically made the trades. After the parties' divorce in 2015, Waas separated from Bellvale and Robert took a 100% interest in the entity. In 2016, a new member joined Bellvale, Al Dopking, which resulted in Robert and Dopking each holding a 50% membership interest in Bellvale and Robert serving as the managing member.

¶ 25    Robert and Dopking receive distributions from Bellvale depending on the month's profits, considering the capital gains earnings in each month. Robert reported $753,348 in capital gains from Bellvale in 2012, $371,492 in capital gains from Bellvale in 2013, $336,177 in capital gains from Bellvale in 2014, $699,739 in capital gains from Bellvale in 2015, $885,320 in capital gains from Bellvale in 2016, and $1,365,399 in capital gains from Bellvale in 2017. Robert acknowledged capital gains increased significantly between 2016 and 2017. Aside from capital gains, no distributions from Bellvale were attributed to Robert in 2015. Additionally, Robert did not take any distributions from Bellvale between January 2016 through April 2016. However, for the remainder of 2016, Robert took $1,498,784 in distributions from Bellvale. In 2017, Robert took $1,091,638 in distributions from Bellvale. Robert estimated that his 2018 income from Bellvale would be down $400,000 from 2017. In addition to Bellvale distributions, Robert regularly reimburses himself from Bellvale for various expenses, including travel, meals and entertainment, home telephone at his residence, his family cellular telephone plan (including the children's phones), health insurance, and a home-office reimbursement.

¶ 26    Robert testified that he has ownership interests in various other entities, including a one-third interest in KJAR, LLC, which owns the building for a restaurant, Potter's, in Naperville, and

a one-third interest in TLCC, LLC, which handles the operations of Potter's. At the time of the divorce, the combined value of KJAR and TLCC was $301,400. Robert kept these entities when the parties divorced and paid Susan for her interest in them. Robert testified that the restaurant had done "substantially better" in the last few years and produced a lot more income, so the value had increased. Robert calculated the combined value of the two Potter's entities at approximately $750,000. At the time of trial, Robert was engaged in litigation with his two Potter's partners, seeking damages of more than $1 million. In 2018, Robert received distribution checks from TLCC totaling $100,000, but he did not cash those checks.

¶ 27    In addition to the Potter's entities, Robert holds a 20% interest in a restaurant, Fiamme. Robert's interest in Fiamme was assigned to him under the judgment of dissolution. Robert also holds a 100% interest in a window company, Benchmark, which he acquired in 2016. At the time of the divorce, Robert had a 13-14% interest in Lulu's, a restaurant in Hawaii. Robert's interest in Lulu's was assigned to him in the judgment of dissolution of marriage. However, Robert was expelled from Lulu's in 2016. At that time, Robert received $124,000, the capital account value when he was expelled. Robert denied having an ownership interest in Liko's Tap and Table, another restaurant in Hawaii, but acknowledged that he transferred $200,000 to Liko's in September 2018. Robert alleged that the transfer was a loan, none of which has been repaid. However, he admitted that he has no loan documents, nothing was finalized on the alleged loan, and he did not disclose any loans payable on his financial affidavit.

¶ 28    In addition to the real estate and business interests described above, Robert's current assets include a Morgan Stanley personal account valued at $110,962, a Morgan Stanley retirement account valued at $293,359, and Morgan Stanley 529 college savings accounts valued at $218,449. Robert valued his current estate at approximately $4.4 million while he estimated the value of

Susan's estate at approximately $2 million.

¶ 29    Robert also testified regarding his travels. Robert was out of town the weekend immediately preceding the hearing in January 2019, he was in Hawaii over winter break from December 2018 through January 2019 and he was in Disney World in December 2018. Robert also traveled to Napa Valley and the Dominican Republic in 2018. In addition, Robert travels to Florida a few times each year. Robert also traveled to Utah and the Maldives in 2017. The cost for Robert's trip to the Maldives was approximately $15,000. At the same time as Robert's December 2017 trip to the Maldives, he gifted a $25,000 engagement ring to Jordan.

¶ 30    Robert testified that his "primary responsibility" is "taking care of [his] children." Robert described his typical day as getting up with the children, making them breakfast, packing their lunches, getting them off to school, helping with homework, making dinner, and spending time with them in the evening. Robert testified regarding additional expenses he incurs for the children, including cell phones, cars, car registration, car insurance, tutoring, college application fees, and college testing fees. Robert testified that he has been asking Susan to contribute to these costs since the care of the children was transferred to him in July 2016, explaining that he did so because "she's a multimillionaire." Robert also related that he incurred an additional $130 per month on his country club membership (in addition to the cost of having a "house membership") so that the parties' sons could swim at the club. Robert asked Susan to contribute one-half of the cost ($65) and Susan agreed.

¶ 31                                  2. Susan's Testimony

¶ 32    Susan related that during the marriage, the parties and their children resided in the Greenlake residence, a 6000-square-feet home with five bedrooms and six bathrooms. The parties purchased the Greenlake residence in December 1998. Susan estimated that the parties spent

approximately $400,000 on improvements to the home during the marriage. These improvements included opening the family room and living room to create an "open flow" and adding a front porch and balcony to the façade to make the residence a "proper colonial" instead of a Georgian-style home. The parties also finished the basement, built a wine cellar, dug out additional storage, added custom millwork, installed and refinished hardwood floors, added balusters to the stairs, painted every room at least once, replaced appliances, installed granite in the kitchen, updated five bathrooms, remodeled the second floor to make bigger bedrooms, and added a stairway to the attic. In addition, the parties finished both the attic (to add a bedroom and bathroom) and the area over the garage (to add a walk-in closet and custom laundry room with two washers, two dryers, two large folding counters, and additional storage). The parties also rezoned the heating and added dual furnaces and garage heating. Outside, the parties had the patio redone several times and installed a fire pit, which was later replaced by an outdoor fireplace.

¶ 33    Susan resided in the Greenlake residence after the divorce and until August 2016, immediately following her suicide attempt. In August 2016, Susan purchased a home in St. Charles for approximately $390,000 and began renting out the Greenlake residence. Susan resided in the St. Charles residence for approximately 10 months. She sold the St. Charles residence in August 2017 for $430,000 because she realized the move was a mistake largely due to its location, 20 minutes away from the children. Susan currently resides in a duplex on Downing Court in Aurora (Downing Court residence), which she purchased in August 2017 for $370,000. The Downing Court residence has four bedrooms and four bathrooms. Susan spent $20,000 on improvements to the Downing Court residence. Susan sold the Greenlake residence in May 2018 for $775,000. Susan deposited a portion of the net proceeds from the sale of the Greenlake residence into her bank account to pay for home improvements, she used some of the funds to pay off a line of credit

on the Downing Court residence, and she invested the remainder. Susan acknowledged that she has no debt.

¶ 34     Susan testified that she obtained a bachelor's degree in elementary education in 1993 and a master's degree in curriculum and instruction in 1998. Susan was employed as a teaching assistant in West Chicago from 1993 through 1995. From 1995 through 2001, Susan worked as a fourth-grade teacher in Indian Prairie School District. Susan resigned from teaching in 2001 to become a stay-at-home mother. The only other employment Susan held during the marriage was a work-from-home position for a start-up company, which lasted six months in 2013. In the five years preceding the divorce, Susan was home during the day and her responsibilities included caring for the children.

¶ 35     Susan testified that during the marriage, the parties regularly vacationed as a couple and as a family. In the five years preceding the divorce, the parties traveled as a couple to Napa Valley, Sonoma, Florida, Italy, Arizona, and New York. In the same period, the parties also took family vacations to Florida, Arizona, and Mexico. During the marriage, the parties had a weekly house-cleaning service and they dined out "frequently" as a couple and as a family. Also during the marriage, Susan took tennis and golf lessons and Pilates classes and worked out with a trainer.

¶ 36     At the time of trial, Susan had a monthly house-cleaning service because she could not afford the more frequent service she enjoyed during the marriage. Susan also testified that she dines out "much less" frequently than she did during the marriage. Moreover, Susan does not take tennis lessons or Pilates classes and she does not have a personal trainer because she cannot afford the expenses. Susan testified that she has been unable to afford any vacations in the last year except for a road trip to Green Lake, Wisconsin.

¶ 37     In May 2016, Susan was admitted inpatient at Linden Oaks for approximately five days

because she was suicidal. Immediately following Linden Oaks, Susan participated in an outpatient program at Meier Clinic, consisting of six hours each weekday of group and individual therapy, one-on-one psychiatric evaluations, and "med adjustments." Susan only completed one of the two weeks of the Meier Clinic program because her treatment was halted when she attempted suicide over the weekend after her first week in the program. Specifically, on June 4, 2016, Susan consumed as many pills as she could find, drank liquid floor cleaner, and attached a pool hose to the exhaust pipe of her car and put it in the window of her vehicle. Susan proceeded to use a butcher knife to cut her wrists, neck, and Achilles tendons, and a power drill to drill her neck and wrists. Susan recalled falling asleep in her vehicle after unsuccessfully attempting to exit the vehicle to get to her bathtub inside the home.

¶ 38    Following her suicide attempt, Susan was admitted to the emergency room at Mercy Hospital. She was later transferred to the psychiatric ward, where she stayed for approximately one week. In mid-June 2016, immediately following the Mercy Hospital treatment, Susan was admitted to Timberline Knolls, a residential intensive psychiatric treatment center. Susan resided inpatient at Timberline Knolls for approximately one month and one week, including at the time of the entry of the July 19, 2016, agreed order. Susan was discharged from Timberline Knolls to an outpatient program at Linden Oaks, but resided at the Greenlake residence. As a result of the injuries Susan sustained during her suicide attempt, she has physical limitations. Susan had surgery on one Achilles tendon in March 2017 but does not believe it has healed as she cannot stand on her toes, run, reach anything up high, stand for too long, or walk very far.

¶ 39    Susan testified that her health was "good compared to where [she] was a couple of years ago." Susan is under the care of a psychiatrist, whom she sees every one to two weeks, and a therapist, whom she sees weekly. Over the last year, Susan has also attended weekly sessions with

a physical therapist and a chiropractor. Susan is also under the care of a general practitioner, who she sees twice a year. Susan takes various prescription medications. In October 2016, Susan began taking Trazadone for insomnia and in October 2017, Susan began taking Effexor for major depressive disorder and generalized anxiety. Susan had been taking Cymbalta for depression but stopped taking it in September 2015.

¶ 40    Susan testified that since entry of the judgment of dissolution, she has applied "to at least 13 school districts within an hour's driving range from [her] home [which] encompasses over 100 schools." Susan's efforts to seek employment as a teacher focused on the spring "hiring season" for teachers in both years 2016 and 2017. Susan later clarified that she had submitted "[a] hundred applications at least," but had not been called for any interviews. Susan believed she was not considered for a teaching position because she had been out of the classroom for over 15 years and would be "expensive to hire" because she holds a master's degree. Susan opined that school districts prefer to hire candidates fresh out of college who are inexpensive and "straight off the learning curve." Susan also sought employment outside of the education field, including positions as a junior copywriter, a social-media-content creator, a children's librarian, and a sales associate at Barnes & Noble and at Anthropologie. Of those applications, Susan was called for one interview, the children's librarian position, but was not hired.

¶ 41    In August 2016, Susan became a part-time "executive independent consultant" for Rodan & Fields, where she consults with potential customers about their skin-care needs and sells skin-care products. Susan's earnings from Rodan & Fields are solely commission based and are paid monthly. Susan estimated that she earned between $6000 and $7000 in 2018 from Rodan & Fields. Susan also briefly worked as a substitute teacher for Indian Prairie School District in the fall of 2017, but she experienced difficulties and ultimately was admitted inpatient at Timberline Knolls

in October 2017 to undergo a medication change after another serious episode with depression. Susan's income tax returns for the years 2016 and 2017 were admitted into evidence. Her adjusted gross income was $89,251 in 2016 and $33,779 in 2017.

¶ 42　Susan began a program for a second master's degree in reading instruction at Olivet Nazarene University online in July 2017. She then switched to National Louis University. Susan chose to initially pursue an additional master's degree because her primary skill set and passion is teaching but she knew she needed to update her skills to become more marketable. She chose reading instruction because the field is desirable and also because there is more time in small groups where Susan could sit rather than stand. Susan did not complete the degree because she could not afford the $16,000 cost of the program.

¶ 43　Susan testified that her expenses were more at the time of the trial as compared to the time of the entry of the July 19, 2016, order. Susan explained that in July 2016, she was residing at Timberline Knolls. Susan's health-insurance provider covered the expenses of her stay at the facility and her only expenses were monthly pool maintenance and basic utilities for the Greenlake residence. Susan's change in monthly expenses included all of the expenses listed on her financial affidavit other than pool maintenance and utilities, including (1) groceries ($800 per month); (2) property repairs and maintenance ($300 per month); (3) transportation ($260 per month); (4) clothing ($300 per month); (5) grooming ($450 per month); (6) entertainment, dining out, and hobbies ($400 per month); (7) gifts ($450 per month); (8) donations ($155 per month); and (9) professional fees ($575 per month). In addition, at the time of entry of the July 2016 order, Susan was not exercising parenting time with the children. In the last year, the parties have been following a parenting-time schedule where Susan exercises parenting time on Thursdays overnight and alternating weekends from Thursdays through Monday morning. Susan pays her monthly expenses

using the maintenance from Robert then drawing from her Morgan Stanley investment account, which consists of her half of the marital estate previously divided. In 2018, Susan withdrew approximately $180,000 to $185,000 from her Morgan Stanly investment account to pay for her expenses. According to Susan's calculations, her assets will be depleted in 8 to 10 years if she continues to withdraw funds at the same rate.

¶ 44    Susan testified that in April 2016, she requested copies of Robert's 2015 tax returns. Robert responded that he had filed an extension. Robert did not file his 2015 income tax returns until October 13, 2016. Susan did not receive Robert's 2015 or 2016 tax returns or any supporting documentation from Robert before she filed her Contempt Petition in December 2017.

¶ 45    On cross-examination, Susan testified that since July 2016, her taxes and utilities have decreased, but she is spending more money on home improvements. Susan further testified that the condition of her health is better at the time of trial than it was two years earlier. Susan admitted that she did not apply for employment in 2018 or 2019. Susan acknowledged that she claimed in her financial affidavit gross income of $33,887 for 2018. Susan testified $30,000 of her income was maintenance and the rest was from Rodan & Fields. Susan later acknowledged that she also had about $24,000 in income from dividends and interest.

¶ 46                        3. Camilla Corso's Testimony

¶ 47    Susan retained Camilla Corso, a certified public accountant and certified financial planner, as an expert. Corso was engaged to review Robert's personal tax returns from 2009 through 2017 as well as partnership tax returns and the activity of Bellvale for tax years 2015 through 2017. Corso reviewed the Bellvale tax returns to determine if the entity presented itself as being in the business of investing assets or trading securities. Corso did not speak to Robert or the accountant who prepared the tax returns. Corso prepared a report dated December 7, 2018, which was admitted

into evidence.

¶ 48    Corso testified that the Internal Revenue Service (IRS) defines a taxpayer who "invests" in securities differently than one who "trades" securities. The activity of the taxpayer defines whether it reflects an "investor" in securities or a "trader" in securities pursuant to IRS regulations. Corso represented that the IRS defines a "trader" as someone who is short term in nature and looking to profit from daily market movements. The IRS further looks to see whether the activity is substantial and if the business activity is carried on with continuity and on a regular basis to determine if "trader" status is warranted. The amount of time the taxpayer devotes to the activity, the frequency and dollar amount of trades, the holding periods for securities, and the extent of which the taxpayer pursues the activity to produce income for a livelihood are also facts and circumstances considered by the IRS in determining if a taxpayer is a trader or investor.

¶ 49    Corso further testified that the nature of the income is typically different with an investor. An investor is not looking to buy and sell on a daily basis as he or she is pursuing capital appreciation or income, such as interest or dividends. Typically, the activity of an investor is not something that would be an activity where distributions are being made to support primary living expenses or primary income sources. An investor engages in more of a long-term, passive-type activity.

¶ 50    Corso concluded that the tax activity of Bellvale was reported as investment in nature on the 2015 tax returns. By contrast, the 2016 and 2017 Bellvale tax returns were different and represented a taxpayer that is a trader in securities. Although Corso did not know the number of trades conducted by Bellvale between 2015 and 2017, she summarized that the trading volume of Bellvale increased in each of those years and that the trading activity in 2017 was substantially higher than the trading activity in 2016. Corso observed that Robert's portion of the capital gains

earned from Bellvale increased from $699,739 in 2015 to $885,320 in 2016 to $1,365,399 in 2017.

¶ 51                                     G. Ruling on Susan's Contempt Petition

¶ 52    On January 24, 2019, during the modification trial, after Susan rested, she asked that a rule

to show cause issue on the remaining count (count I) of her Contempt Petition. Robert argued that

he had already complied with the judgment of dissolution by turning over the tax returns, so a rule

could not issue under *In re Marriage of Berto*, 344 Ill. App. 3d 705 (2003). Robert also argued

that, in any event, he had no obligation to turn over the tax returns after his child-support obligation

terminated pursuant to the July 2016 agreed order. In particular, Robert argued that the judgment

of dissolution terminated his obligation to provide tax returns when he "no longer [had] an

obligation to pay either child support *or* maintenance." (Emphasis added.) Robert interpreted this

language to mean the cessation of either support or maintenance would terminate the turn over

obligation.

¶ 53    The court construed Robert's opposition to the issuance of the rule to show cause as a

motion for directed finding. In a written order entered on January 24, 2019, the trial court granted

Robert's motion for a directed finding as to count I of Susan's Contempt Petition. However, the

court reserved the issue of attorney fees.

¶ 54                                     H. Trial Court's February 2019 Order

¶ 55    On February 27, 2019, the trial court entered an order incorporating a 15-page written

ruling containing its findings. In its ruling, the trial court found that "a substantial change in

circumstances has occurred since the entry of the Agreed Order dated July 19, 2016." With respect

to Susan's needs and expenses, the court explained as follows:

        "In June of 2016, Susan attempted suicide. Consequently, the 2016 Agreed Order was

        entered changing custody, eliminating unallocated support and setting a maintenance

amount. As of July 19, 2016, Susan was hospitalized, without employment and without expenses as she was inpatient at Timberline Knowles [*sic*] residential placement center. In considering a request to modify maintenance, the trial court may consider the financial circumstances and needs of both parties in light of all the facts surrounding both households. In July of 2016, Susan's only expenses were pool maintenance and utilities. She did not have a mortgage. Subsequent to her suicide attempt, she sold her residence and acquired a new home now with a mortgage. In addition, Susan has additional expenses as she has outlined in her [financial affidavit]—which were not in existence at the time of the 2016 Agreed Order."

In addition, the trial court reviewed the factors set forth in section 510(a-5) of the Act (750 ILCS 5/510(a-5) (West 2016)) and explained other changes in Susan's and Robert's circumstances. In particular, the court found that (1) Susan faced an impairment in her present and future earning potential based upon her absence from the teaching field and services as a homemaker for many years during the marriage; (2) Susan faced an impairment in her present and future earning potential based upon her mental health and injuries she sustained as a result of her suicide attempt; (3) Robert had no impairment in his earning capacity and has had quite remarkable economic growth; (4) Robert had been paying "a rather modest amount of maintenance" for a relatively short duration in light of the nearly 17-year marriage; (5) Robert's income had increased substantially and especially relative to Susan's income; and (6) Robert's tax status demonstrated that he had treated Bellvale as a livelihood as opposed to a long-term investment.

¶ 56    Having found a substantial change in circumstances since entry of the 2016 agreed order, the court turned to the issue of the appropriate amount of maintenance. In doing so, the court summarized the relevant facts to each of the factors contained in section 504(a) of the Act (750

ILCS 5/504(a) (West 2018)) as follows:

"(1) The income and property of each party: Susan earns under $10,000 per year and Robert earns over $1 million; however, Susan has approximately $2 million from her estate and other investments she has made post decree; whereas, Robert's estate is approximately $4 million;

(2) The needs of each party: as discussed above, Susan's needs have increased since the July 2016 Order, whereas Robert's have appeared to remain relatively the same;

(3) Robert has a much greater realistic earning potential than does Susan as evidenced by his increase in income since the divorce as well as the time Susan stayed home to raise the children and the resultant gap in her employment as a school teacher (substitute, full-time or reading specialist); Susan will most likely never make as much money or even have the potential to make as much money as Robert; also, the infirmities as well as the side consequences of her suicide attempt impair Susan's earning potential, previously discussed;

(4) Susan did spend a majority of the parties' marriage raising the children and now Susan encounters difficulties in finding work from her employer-costly Master's degree and 18-year gap in full-time employment, and conversely, Robert has flourished from that ability to develop his career with Susan staying home to raise the children;

(5) There does not seem to be any impairment to Robert's future earning potential, save for the unpredictability of the market; yet, to date, Robert has shown continuous and consistent growth in his employment;

(6) There has only been approximately four years since the parties were divorced and Susan has taken steps to become self-sufficient; Susan has applied for a number of jobs and her

advanced degree has been an obstacle in light of her significant absence from the work-force; Robert would contend that Susan's withdrawal from her second Master's program (reading specialty) somehow shows an improvement to her status; however, the dependent former spouse does not have an affirmative obligation, in every case, to seek education or training and Susan's efforts, to date, in light of her circumstances are reasonable;

(6.1) the current parenting plan and allocation of parental responsibilities have not impaired Robert's ability to continue to earn money at his current level, so, he obviously can do both;

(7) the standard of living during the marriage was quite high;

(8) the duration of the marriage was almost 17 years;

(9) Susan is 47 and Robert is 48, they are both in good health, however, Susan suffers from a mental disorder and is under the care of a physician, her employment skills are outdated and she is in need of financial support;

(10) The Court previously discussed the parties' income and available property from all sources;

(13) there was a valid agreement of the party [*sic*] of which the Agreed Order of July 19, 2016 has other provisions."

¶ 57     The trial court then noted that the parties' combined annual income exceeded $500,000 and therefore, the award of maintenance is "not automatically in accord with the statutory guidelines." Nevertheless, the trial court stated that since the July 2016 agreed order predated the 2019 maintenance statute, it would calculate maintenance based upon section 504(b-1)(1)(A-1) of the Act (750 ILCS 5/504(b-1)(1)(A-1) (West Supp. 2019) (providing formula for calculating modification of certain maintenance orders entered before January 1, 2019)). The trial court set

maintenance based on the "three-year average of the capital gains earned by Bellvale between 2012-2014, instead of off Robert's gross income." This conclusion was made because the time period embodied a period covering the last three years of the parties' marriage, therefore representing the "approximate standard of living" of the parties. Also, the trial court stated that it chose "only the Bellvale income closer in time to the marriage because to grant Susan's request would amount to an astronomical windfall to her and an almost 900% increase in maintenance payments from $2500 to the suggested $25,000." The trial court cited *In re Marriage of Plotz*, 229 Ill. App. 3d 389 (1992), to note that a payee does not automatically participate in the good fortune of the payor spouse after a divorce. After the trial court determined the level of incomes of the parties ($487,008 for Robert, $6996 for Susan), it applied the statutory guideline formula and increased the monthly maintenance payable by Robert to Susan to $12,058.58, retroactive to the filing of Susan's Modification Petition. See 750 ILCS 5/504(b-1)(1)(A-1) (West Supp. 2019).

¶ 58    The trial court incorporated its prior grant of Robert's motion for directed finding as to count I of Susan's Contempt Petition because Robert "purged" this claim by tendering his tax information and corresponding documentation prior to the hearing. However, the trial court found that Robert's failure to turn over tax returns was without compelling cause or justification and ordered Robert to pay $2000 as and for Susan's reasonable attorney fees and costs.

¶ 59    The trial court noted that Robert filed a counter-petition for child support, alleging a substantial change in circumstances relative to the parties since the entry of the July 19, 2016, agreed order which found that Susan's child support obligation had been considered in setting the $2500 per month maintenance award. The trial court concluded that Robert had presented scant evidence regarding a change in circumstances, including having presented no specific evidence of any change in the increased financial needs of the children from July 19, 2016, until the hearing

date. The trial court also concluded that there had not been a substantial change in Susan's employment circumstances since the entry of the July 2016 order as she earned between $6000 and $7000 annually, but made less than $3000 in 2018. Despite such findings, the trial court ultimately found that the modification of maintenance resulted in a substantial change to Susan's financial circumstances, resulting in an increased ability to pay child support.

¶ 60   In making its determination of child support, the trial court noted that the parties' combined income exceeded the highest level of basic child support and therefore, the trial court used its discretion in setting the child support amount pursuant to section 505(a)(3.5) of the Act (750 ILCS 5/505(a)(3.5) (West 2018)). The trial court set child support based upon a gross annual income of $1 million for Robert, less his newly ordered maintenance obligation, and a gross annual income of $7000 for Susan, plus her newly ordered maintenance award. Using these figures, the trial court calculated Susan's child-support obligation payable to Robert as $718 per month, retroactive to the date of filing of Susan's Modification Petition. With the offset for child support, the court ordered Robert to pay Susan $11,340.58 per month as maintenance.

¶ 61   On March 26, 2019, Robert filed a notice of appeal from the trial court's order. On March 28, 2019, Susan filed a notice of cross-appeal.

¶ 62                                  II.  ANALYSIS

¶ 63   Robert raises various issues on appeal, but they can be divided into two principal categories. First, Robert challenges the trial court's decision to grant Susan's request for an increase in maintenance. Second, Robert argues that the trial court erred in awarding attorney fees in connection with count I of Susan's Contempt Petition. In her cross-appeal, Susan argues that the trial court erred in its calculation of Robert's income when setting maintenance.

¶ 64                                  A. Maintenance

¶ 65    As his first assignment of error, Robert first maintains that the trial court erred in granting Susan's Modification Petition and increasing his maintenance obligation to her. Robert's argument consists of a number of sub-arguments. Specifically, Robert contends that the trial court: (1) erred as a matter of law in considering evidence pre-dating the last modification order; (2) improperly found that a substantial change in circumstances had occurred since the last maintenance modification order; (3) improperly determined that a maintenance modification was justified; and (4) improperly increased the amount of Susan's maintenance fivefold, thereby providing a "grossly inequitable windfall to Susan." In her cross-appeal, Susan disputes the trial court's calculation of Robert's gross income in setting her maintenance award.

¶ 66                                1. Applicable Law

¶ 67    In considering a petition to modify maintenance, the trial court engages in a two-step analysis. *In re Marriage of Barnard*, 283 Ill. App. 3d 366, 370 (1996) (holding that petitions to modify payment orders require the trial court to engage in a two-step process); *In re Marriage of Lasota*, 125 Ill. App. 3d 37, 42 (1984) ("[M]odification of a maintenance award must be based upon the factors outlined in Section 504 *and* upon a showing of a 'substantial change in the circumstances of the parties.' ") (Emphasis added.). Initially, the court determines whether a substantial change in circumstances has occurred. 750 ILCS 5/510(a-5) (West 2016). A "substantial change in circumstances" means that either the needs of the spouse receiving maintenance or the ability of the spouse paying the maintenance has changed. *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 132. In either event, the change must be "substantial" rather than trivial. 750 ILCS 5/510(a-5) (West 2016); *Nordstrom v. Nordstrom*, 36 Ill. App. 3d 181, 184 (1976). The party seeking modification of a maintenance award has the burden of establishing that a substantial change in circumstances has occurred. *In re Marriage of Bernay*, 2017 IL App (2d)

160583, ¶ 14; *Shen*, 2015 IL App (1st) 130733, ¶ 132; *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198 (2011). Moreover, where a modification has been sought more than once, the trial court is to consider only the facts that occurred since the last modification hearing and to modify the award only upon a substantial change in circumstances since that date. *Bernay*, 2017 IL App (2d) 160583, ¶ 15; *Anderson*, 409 Ill. App. 3d 191, 198-99 (2011). If the petitioner meets his or her burden of establishing a substantial change in circumstances, the court then proceeds to the second step of the analysis. That is, the court must consider whether to modify the support award and to what extent. 750 ILCS 5/510(a-5) (West 2016); *Barnard*, 283 Ill. App. 3d at 370; see also *Anderson*, 409 Ill. App. 3d at 203 (noting that a showing of a substantial change in circumstances allows the court to modify a maintenance award but does not require it to do so).

¶ 68    In determining whether the modification or termination of maintenance is warranted, a court considers the factors set forth in sections 504(a) and 510(a-5) of the Act (750 ILCS 5/504(a), 510(a-5) (West 2016)). See *Blum v. Koster*, 235 Ill. 2d 21, 35-36 (2009) (holding that the trial court is required to consider the factors in sections 504(a) and 510(a-5) in determining whether to modify maintenance); *Anderson*, 409 Ill. App. 3d at 204; *Lasota*, 125 Ill. App. 3d 37, 42 (1984). No single statutory factor is determinative, and the trial court is not limited to reviewing the factors outlined in the statute. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 651 (2008).

¶ 69    A trial court's decision to modify maintenance will not be disturbed on appeal absent an abuse of discretion. *Blum*, 235 Ill. 2d at 36. An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93. When a party challenges the trial court's factual findings regarding a maintenance determination, the reviewing court will not reverse the trial court's findings unless they are against the manifest

weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30; *In re Marriage of Nord*, 402 Ill. App. 3d 288, 294 (2010). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or if the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. Moreover, on review, we may affirm the trial court's judgment on any basis supported by the record. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24. With these considerations in mind, we turn to the parties' arguments.

¶ 70                                   2. Last Modification Order

¶ 71    Initially, Robert asserts that to avoid litigating matters already settled, the parties to a modification proceeding are only allowed to present evidence which goes back to the last petition for modification. Robert notes that the last modification in this case occurred upon the entry of the July 19, 2016, agreed order, which terminated his obligation to pay monthly unallocated family support of $5583 and provided Susan with $2500 in monthly maintenance. Robert therefore asserts that the trial court's consideration of any alleged substantial change in circumstances was limited to events occurring only after the July 19, 2016, agreed order. According to Robert, however, the court "openly and repeatedly ventured far outside that time period," even hearing, over his repeated objections, evidence dating back to the 1990s. Robert contends that the trial court's consideration of evidence predating the last modification order was improper as a matter of law and requires reversal of the February 27, 2019, order granting Susan's modification petition.

¶ 72    Susan responds that Robert's argument fails to recognize the two-step analysis applicable to maintenance-modification proceedings. Susan does not dispute that where a modification has been sought more than once, the first step of the analysis requires the court to determine whether a substantial change in circumstances has occurred since entry of the last modification order. She

argues, however, that the second step of the analysis, *i.e.*, whether to modify the maintenance award and to what extent, requires consideration of statutory factors that expressly reference the circumstances of the parties' marriage. Susan further asserts that the trial court in this case did not consider evidence predating July 2016 in finding a substantial change in circumstances had occurred.

¶ 73    As noted above, modification proceedings involve a two-step analysis. The trial court must initially determine whether a substantial change in circumstances has occurred. 750 ILCS 5/510(a-5) (West 2016). If the trial court finds that a substantial change in circumstances has occurred, it must then determine whether and to what extent to modify the maintenance obligation. *Blum*, 235 Ill. 2d at 35-36; *Anderson*, 409 Ill. App. 3d at 204; *Lasota*, 125 Ill. App. 3d 37, 42 (1984). Case law clearly supports the notion that where a modification has been sought more than once, the trial court is to assess whether a substantial change in circumstances has occurred only since the last modification order. *Bernay*, 2017 IL App (2d) 160583, ¶ 15 ("[T]he trial court was free to review or terminate maintenance *provided* that there had been a substantial change in circumstances since maintenance had been ordered." (Emphasis in original.)); *Anderson*, 409 Ill. App. 3d at 198-99 ("[W]here a modification has been sought more than once, the trial court is to consider the facts that occurred since the last modification hearing and to alter the award only upon a showing of a substantial change in circumstances since that date.").

¶ 74    However, nothing in section 510(a-5) of the Act (820 ILCS 5/510(a-5) (West 2016)) prohibits a trial court from hearing evidence regarding the circumstances of the parties prior to the last modification. Indeed, such evidence is relevant to the second step of the maintenance-modification analysis, *i.e.*, whether to modify the maintenance award and to what extent. While Robert correctly observes that section 510(a-5)(7) of the Act (750 ILCS 5/510(a-5)(7) (West

2016)) explicitly requires that the trial court consider "the increase or decrease in each party's income *since the prior judgment or order from which a review, modification, or termination is being sought*" (emphasis added), this is but one of many statutory factors the trial court is directed to consider. Several other statutory factors relevant to a maintenance modification *require* consideration of evidence predating the last modification. See, *e.g.*, 750 ILCS 5/510(a-5)(6) (West 2016) ("the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage *** and the present status of the property"); 750 ILCS 5/510(a-5)(8) (West 2016) ("the property acquired and currently owned by each party after entry of the judgment of dissolution of marriage"); 750 ILCS 5/504(a)(4) (West 2016) ("any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage"); 750 ILCS 5/504(a)(7) (West 2016) ("the standard of living established during the marriage"); 750 ILCS 5/504(a)(12) (West 2016) ("contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse"); see also *In re Marriage of Sadovsky*, 2019 IL App (3d) 180204, ¶ 46 (noting that in evaluating whether to modify or terminate maintenance, the court must consider the statutory factors in section 504(a) of the Act).

¶ 75    In support of his position, Robert directs us to three cases: *In re Marriage of S.D.*, 2012 IL App (1st) 101876, *Anderson*, 409 Ill. App. 191 (2011), and *In re Marriage of Connors*, 303 Ill. App. 3d 219 (1999). We find nothing in these cases that is inconsistent with our holding here. The courts in all three of these cases recognized that where a party has established a substantial change in circumstances, the court must then consider the statutory factors. *S.D.*, 2012 IL App (1st) 101876, ¶ 44 (noting that the trial court must consider the factors outlined in sections 504(a) and

510(a-5)); *Anderson*, 409 Ill. App. 3d at 203-204 ("A court which has found a substantial change in circumstances must then weigh the same factors it considered when making the initial award of maintenance"); *Connors*, 303 Ill. App. 3d at 227 ("In order to determine whether and to what extent maintenance should be modified, a trial court should consider the same factors it considers in making an initial award"). As noted above, several of these statutory factors expressly reference circumstances predating the last modification order. Moreover, in all three of the cases cited by Robert, the trial courts *did* hear evidence of the standard of living during the marriage. See *S.D.*, 2012 IL App (1st) 101876, ¶¶ 8, 41-42 (noting that the trial court at the modification hearing allowed the wife to testify to the standard of living she enjoyed during the marriage); *Anderson*, 409 Ill. App. 3d at 208-09 (discussing testimony at trial regarding standard of living during the marriage); *Connors*, 303 Ill. App. 3d at 230 (observing that the trial court's comments at the maintenance review hearing indicated that it had considered the parties' standard of living in making its ruling).

¶ 76     In its ruling, the trial court repeatedly stated that it had found a substantial change in circumstances "since the entry of the Agreed Order dated July 19, 2016," which was the last modification order. Nevertheless, Robert insists that the trial court "openly and repeatedly ventured far outside" the relevant time period. In support of this argument, Robert observes that Susan "invited the court to impermissibly consider evidence dating all the way back to the parties' divorce" and his objections to questions, testimony, and the admission of evidence concerning events predating the entry of the July 19, 2016, order were overruled throughout the trial. Robert also contends that the trial court seemed confused as to the time period to establish a substantial change in circumstances. Based on our review of the record and the trial court's order, however, Robert's observations do not compel a finding that the trial court improperly considered evidence

predating the last modification order, *i.e.*, the agreed order of July 19, 2016, in assessing whether Susan established a substantial change in circumstances.

¶ 77    It is true that Susan's Modification Petition alleged that a substantial change in circumstances had occurred "since the entry of the Judgment of Dissolution of Marriage and [the] July 19, 2016 Order." However, Robert successfully moved to strike the allegations with respect to the circumstances as of the date of the judgment of dissolution. In fact, the parties emphasized the scope of the pending pleadings immediately prior to the commencement of trial. At that time, Robert reiterated that his motion to strike had been allowed. Susan agreed, noting that the order had "stricken reference to the judgment time period in the petition [to modify], but otherwise allow [*sic*] the petition to stand." Moreover, during both parties' opening statements, they emphasized that the relevant time period for the showing of a substantial change of circumstances commenced on the date of the entry of the last modification, *i.e.*, the July 19, 2016, agreed order. Although the trial court allowed the introduction of evidence predating the July 19, 2016, order, such evidence was relevant to the second step of the maintenance-modification analysis, *i.e.*, whether to modify the maintenance award and to what extent. Without evidence predating the last modification order, the trial court would be unable to assess the relevant statutory factors that require consideration of evidence predating the last modification. *Sadovsky*, 2019 IL App (3d) 180204, ¶ 47 (noting that any refusal to consider evidence regarding the statutory factors "is in direct contravention of the statutory guidelines").

¶ 78    Moreover, contrary to Robert's claim, the trial court was not confused as to the relevant time period for assessing a substantial change in circumstances. To be sure, in overruling one of Robert's objections, the trial court, on one occasion, indicated that it was considering evidence dating from the time of entry of the judgment of dissolution until the July 2016 modification. But

the court shortly later stated that Susan has "to prove [Robert's] change in circumstances from—not from the date of the entry of the judgment." The court reiterated this understanding in its ruling, repeatedly finding that it had found a substantial change in circumstances since entry of the July 19, 2016, agreed order. As noted above, the court found that Susan's expenses and needs had increased since the date of the July 2016 agreed order and Robert's income had increased substantially since that time.

¶ 79    In short, we do not find anything in the record to reflect that the trial court improperly considered evidence predating the last modification order in assessing whether Susan established a substantial change of circumstances. Accordingly, we reject Robert's argument for reversal on this basis.

¶ 80                    3. Whether a Substantial Change in Circumstances Occurred

¶ 81    Robert next argues that Susan failed to establish a substantial change in circumstances justifying a maintenance modification. Robert's argument in this regard is twofold. First, Robert argues that Susan failed to prove any substantial change in her circumstances justifying a maintenance modification. Second, Robert argues that Susan failed to prove any substantial change in his circumstances justifying a maintenance modification. Susan responds that the trial court did not err in finding that a substantial change in circumstances had occurred since the entry of the July 19, 2016, order. In this regard, Susan argues that not only did Robert's income substantially increase since July 2016, but her needs and expenses substantially increased as well.

¶ 82    As noted above, a "substantial change in circumstances" means that either the needs of the spouse receiving maintenance or the ability of the spouse paying the maintenance has changed. *Shen*, 2015 IL App (1st) 130733, ¶ 132. The trial court found that Susan established a substantial change in circumstances since the entry of the July 19, 2016, order in both (1) her needs and

expenses and (2) Robert's ability to pay. The evidence of record supports these findings. As the trial court noted, when the July 2016 agreed order was entered, Susan was hospitalized and without employment. At that time, her only expenses were pool maintenance and utility costs related to the Greenlake residence. After Susan was released from treatment, Susan incurred additional expenses as detailed on her financial affidavit and in her testimony. These expenses included not only her own household and living expenses, but also expenses related to exercising her parenting time with the children, which she did not have at the time of entry of the July 2016 order because of her hospital stay. Further, after July 2016, Robert's income increased substantially. Robert's share of Bellvale's capital gains went from $885,320 in 2016 to $1,365,399, an increase of more than $480,000. Robert himself admitted at trial that Bellvale's capital gains "increased significantly" between 2016 and 2017. Further, Robert did not take any distributions from Bellvale in 2016 until May, the same month that his support obligation was reduced from $5583 in unallocated family support to $2500 in maintenance. By the end of the year, Robert had taken distributions from Bellvale totaling more than $1.498 million. Further, in 2017, Robert took more than $1.091 million in distributions from Bellvale. Robert's increase in income is also reflected in his tax returns, which show an increase in adjusted gross income from $1,009,810 in 2016 to $1,442,842 in 2017. Review of a trial court's finding of a substantial change in circumstances is a factual determination. *In re Marriage of Armstrong*, 346 Ill. App. 3d 818, 821 (2004); *Barnard*, 283 Ill. App. 3d at 370. As such, the trial court's assessment is entitled to great deference because it is in a superior position to observe the witnesses' demeanors, resolve conflicts in the testimony, and determine the credibility of the witnesses. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). Here, the trial court determined that Susan established a substantial change in circumstances relative to both her needs and expenses and Robert's income. Given the evidence of record, the trial court's

role as fact finder, and the deferential standard of review, we cannot say that a conclusion opposite that of the trial court is clearly apparent or that the trial court's finding is unreasonable, arbitrary, or not based on the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 83                                    4. Whether to Modify Maintenance

¶ 84    Robert acknowledges that maintenance may be modified when there is a substantial change in the needs of the payee spouse. Nevertheless, Robert insists that any substantial change in Susan's circumstances did not justify a maintenance modification because Susan was significantly better off at the time of trial than she was in July 2016. In this regard, Robert asserts that Susan's real-estate taxes and home utilities are less than they were in July 2016. Robert further asserts that Susan's testimony of increased expenses since entry of the July 19, 2016, agreed order is not supported by her testimony at trial or a review of her financial affidavit. According to Robert, the largest line items on Susan's financial affidavit—line items for categories such as clothing, grooming, entertainment, and dining out—"are discretionary, not quantifiable, and subjective." Robert further asserts that Susan listed child-related expenses on her financial affidavit that either no longer exist ($660 per month for orthodontia) or are overstated ($130 per month for her contribution to the children's country club membership when the actual cost is only $65 per month). Robert acknowledges that Susan's home-improvement expenses have increased but, citing *In re Marriage of Fazioli*, 202 Ill. App. 3d 245 (1990), he asserts that Susan's decisions "to make entirely elective renovations to her home does not support a modification where they were not fortuitous but instead were deliberately assumed."

¶ 85    Robert's contentions are not entirely without merit. Susan acknowledged that her taxes and utilities have decreased. There is also support for Robert's claim that Susan listed some non-existent or overstated child-related expenses on her financial affidavit. Nevertheless, Robert does

not point to anything so compelling that it requires a finding that the trial court abused its discretion in granting Susan's request for a modification of maintenance. As noted above, in deciding whether to modify maintenance, the trial court is instructed to consider various factors, including the standard of living during the marriage. 750 ILCS 5/510(a-5), 504(a)(7) (West 2016). The trial court heard ample testimony that Susan could not live at the standard established during the marriage on the income available to her without depleting her assets. In this regard, Susan testified about the extensive renovations the parties made to the Greenlake residence during the marriage, which totaled about $400,000. Susan also testified that the parties traveled regularly, both as a couple and as a family and domestically and internationally. Further, Susan testified that during the marriage the parties had a weekly house-cleaning service, they dined out "frequently" as a couple and as a family, and she took various classes and worked out with a trainer. Susan testified that she had to cut back or eliminate many of these items due to their cost. At trial, Robert did not dispute the merits of this testimony. In addition, Robert's reliance on *Fazioli* is misplaced. In that case, the reviewing court affirmed the denial of a petition to increase maintenance, noting, in part, that many of the improvements to the wife's home were not necessary. *Fazioli*, 202 Ill. App. 3d at 250. Here, Robert did not contest the necessity of the renovations done by Susan. Moreover, as noted above, extensive home renovations were customary during the marriage. Given this evidence, the trial court could have reasonably concluded that Susan's receipt of monthly maintenance of $2500 rendered her unable to maintain a lifestyle reflective of the standard of living attained during the marriage without depleting her assets.

¶ 86    Robert contends that Susan's lack of debt also supports a finding that her circumstances are either consistent or improved. Yet, Susan testified that she withdrew between $180,000 and $185,000 from her brokerage account in 2018. It is well settled that a spouse seeking maintenance

should not be required to sell assets or impair capital to maintain himself or herself in a manner commensurate with the standard of living during the marriage as long as the payor spouse has sufficient assets to meet both his needs and the needs of his or her former spouse. *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1044 (2008); *In re Marriage of Drury*, 317 Ill. App. 3d 201, 207 (2000). According to Susan' calculations, her assets will be depleted in 8 to 10 years if she continues to withdraw funds at the same rate. While Robert claims that Susan's testimony that she spent approximately $180,000 to $185,000 for her living expenses in 2018 was vague "and without any detail or evidence in support," Susan did submit at trial credit card and brokerage statements for 2018 detailing her financial transactions. The trial court could have reasonably concluded that this evidence was sufficient to substantiate Susan's claimed expenses.

¶ 87     Robert also asserts that Susan's income situation has improved since the last modification order. Robert observes that Susan was unemployed at the time of the entry of the July 2016 agreed order but was employed as a sales consultant for Rodan & Fields at the time of trial. In addition, Robert asserts that Susan has other, non-employment sources of income, including interest and dividend income "on her substantial estate" and income from renting out the Greenlake residence after the divorce. However, Susan's income from Rodan & Fields was minimal, amounting to between $6000 and $7000 in 2018 according to Susan's estimate. In addition, Susan's tax returns reflect any interest and dividend income she received. Moreover, although Robert correctly observes that Susan's tax return for 2016 reflects $51,000 in rents received in connection with the Greenlake residence and her 2017 tax return reflects $31,000 in rents received in connection with the Greenlake residence, he fails to acknowledge that this income was offset by expenses associated with renting the property. More significantly, as Robert concedes, Susan sold the Greenlake residence in August 2018, prior to the hearing on the Modification Petition. Thus, it no

longer constitutes a source of income for Susan.

¶ 88    Robert also disputes the trial court's finding that there is an impairment to Susan's present and future earning potential based on her mental health and the injuries she sustained as a result of her suicide attempt. See 750 ILCS 5/510(a-5)(3) (West 2016). Robert argues that Susan's health was better off at the time of trial than it was at the time of the July 2016 agreed order. At the time of the entry of the July 2016 agreed order, Susan was institutionalized as a result of her suicide attempt. Susan recovered from her suicide attempt and testified that her health was "good compared to where [she] was a couple of years ago." However, at the time of trial, she was still under the care of a psychiatrist, was attending weekly sessions with a physical therapist and a chiropractor, and was taking various prescription medications. Moreover, Susan had another serious episode of depression in the Fall of 2017, which prompted an inpatient admission at Timberline Knolls and a medication change. Susan also suffers from physical limitations as a result of her suicide attempt, including difficulty standing on her toes, running, reaching high objects, standing for extended periods, and walking long distances. Given this evidence, the trial court's conclusion that there was an impairment to Susan's present and future earning potential based on her mental health and the injuries she sustained as a result of her suicide attempt was a reasonable conclusion and not against the manifest weight of the evidence.

¶ 89    Robert also criticizes Susan for failing to make "a real effort to find appropriate work." But the trial court found that Susan made "reasonable efforts to try to find employment commensurate with her education, training, and background." See 750 ILCS 5/510(a-5)(2) (West 2016). This was also a reasonable conclusion based on the evidence of record. Although Susan held a bachelor's degree in elementary education and a master's degree in curriculum and instruction, she had not worked outside of the home for the majority of the parties' marriage. As the trial court recognized,

because of this gap in her employment, Susan has encountered difficulties in finding work as a teacher. Susan testified that she focused her efforts on the spring hiring season in 2016 and 2017. Susan applied "to at least 13 school districts" within an hour's driving range of her home. Susan later clarified that she had submitted "[a] hundred applications at least," but had not been called for any interviews. Susan attributed her failure to find employment to the gap in her employment and the salary she would receive because of her education level. Susan also sought employment outside of the education field, including positions as a copywriter, a social-media content creator, a children's librarian, and a retail sales associate. Susan was called for only one interview, but did not receive a job offer. Robert disputes Susan's testimony regarding the extent of her search for a teaching position. He asserts that Susan "first testified that she applied to 13 school *districts*, which she alleged contained 'over 100 schools,' and then repeatedly and disingenuously referred to her '100 applications' as if she had actually applied for 100 separate positions." (Emphasis in original.). However, Susan did testify that she had submitted "[a] hundred applications at least." Whether to believe Susan was a matter for the trial court as the trier of fact. *Gherna*, 203 Ill. 2d at 175. Considering this evidence, the trial court's finding that Susan made reasonable efforts to find employment commensurate with her education, training, and background was not against the manifest weight of the evidence.

¶ 90    Robert further observes that section 510(a-5)(5) of the Act (750 ILCS 5/510(a-5)(5) (West 2016)) directs the trial court to consider the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage. Robert acknowledges that the trial court considered this factor but argues that the court focused on the total amount paid rather than the duration. We disagree. The trial court expressly stated that the July 2016 agreed order provided for Susan to receive another nine years of maintenance before it was set to be reviewed

in June 2028. Thus, we find no error here.

¶ 91 Additionally, Robert disputes the trial court's finding that any substantial change in his income justified a maintenance modification. Robert argues principally that his income "remains volatile and uncertain just as it was at the time of the 7/19/16 Order." The trial court addressed this concern, noting that there does not seem to be an impairment to Robert's future earning potential "save for the unpredictability of the market; yet to date, Robert has shown continuous and consistent growth in his employment." Robert further asserts that even if Susan succeeded in showing a substantial increase in his income, "without a corresponding and legitimate increase in her needs a maintenance modification is not appropriate." In support of this position, Robert again directs us to *S.D.*, 2012 IL App (1st) 101876, ¶ 44. According to Robert, *S.D.* stands for the proposition that "[a] party need not pay more maintenance 'merely because he has the ability to do so;' instead, the court must consider the applicable statutory factors and increase maintenance *only where the needs of the maintenance recipient have changed*." However, Robert misinterprets the holding from *S.D.* The *S.D.* court actually stated that the court must consider the statutory factors "and award an increase or decrease in maintenance only where 'the needs of the spouse receiving the alimony change or the ability of the other spouse to pay alimony changes.' " *S.D.*, 2012 IL App (1st) 101876, ¶ 44 (quoting *Shive v. Shive*, 57 Ill. App. 3d 754, 760 (1978)). Thus, contrary to Robert's representation, a change in the ability of the payor spouse to pay is sufficient, in conjunction with the statutory factors, to modify a maintenance award. In any event, we agree with the trial court that Susan established both a substantial change in her needs and in Robert's ability to pay so as to warrant a maintenance modification.

¶ 92 In short, we conclude that the trial court did not abuse its discretion in finding that the substantial change in circumstances established by Susan were sufficient to justify a maintenance

modification.

¶ 93                                    5. Maintenance Amount

¶ 94    Next, Robert argues that even if a substantial change in circumstances justifying a maintenance modification did occur, the trial court's "almost fivefold increase was illogically calculated, excessive, and a grossly inequitable windfall to Susan." In this regard, Robert notes that the trial court explicitly acknowledged that the statutory formula found in section 5/504(b-1) of the Act (750 ILCS 5/504(b-1) (West 2016)) did not apply because the parties' combined incomes were above the $500,000 cap, but proceeded to apply the statutory formula anyway. Moreover, Robert argues that in applying the formula, the court used the three-year average of his income from Bellvale for the years 2012 through 2014, reasoning that it represented the approximate standard of living of the parties during the marriage. Yet, for Susan, the court used the $7000 in annual income Susan claimed to have earned from Rodan & Fields in 2017, without regard to the interest, dividend, and rental income she also received that year. Robert notes that the court's calculation resulted in his maintenance obligation rising from $30,000 per year to more than $144,000 per year, an amount well in excess of the $82,284 Susan's financial affidavit claimed she needed to live on each year and more than double the $66,996 per year which the parties' MSA awarded Susan for the care of herself and the parties' three children. According to Robert, the court's approach ignored the fact that the parties' standard of living during the marriage was established by the provisions of their MSA, completely disregarded Susan's needs, and defied logic.

¶ 95    Susan responds that the maintenance ordered was not excessive or grossly inequitable to Robert. Susan asserts that when the payor spouse is a high-income earner throughout the marriage and post-divorce, application of the statutory factors supports a correspondingly high maintenance

award.

¶ 96    Generally, a trial court's award of maintenance is presumed to be correct. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 26; *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010). A trial court has broad discretion to determine the amount of a maintenance award, and we will not reverse the trial court's decision unless it constitutes an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005); *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1062 (2005). As noted above, an abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *Johnson*, 2016 IL App (5th) 140479, ¶ 93. To the extent a party challenges the factual findings underlying the maintenance order, we will not disturb those findings unless they are against the manifest weight of the evidence. *Brill*, 2017 IL App (2d) 160604, ¶ 30. A finding of fact is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 97    The amount and duration of maintenance is governed by section 504(b-1) of the Act (750 ILCS 5/504(b-1) (West 2016)). That section provides that if the court finds that a maintenance award is appropriate, it shall order guideline maintenance in accordance with section 504(b-1)(1) (750 ILCS 5/504(b-1)(1) (West 2016)) or non-guideline maintenance in accordance with section 504(b-1)(2) (750 ILCS 5/504(b-1)(2) (West 2016)). Section 504(b-1)(1) (750 ILCS 5/504(b-1)(1) (West 2016)) sets forth a formula for setting the amount and duration of a maintenance award. In addition, section 504(b-1)(1)(A-1) (750 ILCS 5/504(b-1)(1)(A-1) (West Supp. 2019)) provides a formula for modification of maintenance orders entered before January 1, 2019. Section 504(b-1)(2) (750 ILCS 5/504(b-1)(2) (West 2016)) directs that any non-guideline award of maintenance

"shall be made after the court's consideration of all relevant factors" set forth in section 504(a) of the Act. The trial court assesses the statutory factors in light of the reasonable needs of the party seeking maintenance, as measured by the standard of living the parties enjoyed during the marriage. See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 51; *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶¶ 19-20.

¶ 98 As Robert correctly points out, the trial court in this case determined that the statutory maintenance guidelines did not apply because the parties' combined annual incomes exceeded $500,000. Robert complains that the trial court applied the statutory guidelines anyway, but he does not cite any statute or case law prohibiting the court from doing so, and we decline to disturb the maintenance award on this basis given the wide latitude granted the trial court in fashioning a maintenance award.

¶ 99 Moreover, we are not persuaded that the increase in the maintenance obligation from $30,000 per year to more than $144,000 per year rendered the trial court's decision an abuse of discretion. In its order, the trial court found that the July 2016 agreed order "was simply a stopgap to change the allocation of parenting time and parental responsibilities for the safety of the children" and that "[a]nything related to the financial situation of either Robert or Susan was an ancillary consideration." The evidence of record supports this finding. Of note, the July 2016 agreed order was entered while Susan was still hospitalized following her suicide attempt the month earlier. Thus, the trial court could have reasonably concluded that the amount of maintenance provided for in the July 2016 agreed order did not contemplate the parties' circumstances following Susan's release from the hospital. Likewise, we do not find the fact that the MSA awarded Susan $66,996 per year for the care of herself and the parties' three children indicative of an excessive maintenance modification. The circumstances at the time of the entry of

the MSA were entirely different as Robert had recently lost his job and his financial and employment future was in flux. For this same reason, we find Robert's claim that the MSA reflected the parties' standard of living during the marriage not well taken. Indeed, Susan testified to the standard of living during the marriage, which included extensive home renovations, domestic and international travel, a weekly house-cleaning service, pool maintenance, various lessons for Susan, and a personal trainer for Susan. Finally, while the modified maintenance award exceeds Susan's claimed needs on her financial affidavit, it is consistent with Susan's testimony that she had to withdraw in excess of $180,000 from her investment account to meet her living expenses. Based on the evidence of record, the trial court could have reasonably concluded that the amount of maintenance awarded reflected the reasonable needs of Susan as measured by the standard of living the parties enjoyed during the marriage. See *Blume*, 2016 IL App (3d) 140276, ¶ 51; *Micheli*, 2014 IL App (2d) 121245, ¶¶ 19-20. As such, we reject Robert's claim that the trial court's decision to increase his maintenance obligation to Susan to $12,058.58 per month constituted an abuse of discretion.

¶ 100                                6. Susan's Cross-Appeal

¶ 101   In her cross-appeal, Susan argues that the trial court's maintenance award did not reflect the parties' lifestyle and income level during the marriage because it failed to consider Robert's income from all sources during the relevant time period. According to Susan, in lieu of the "three-year average of the capital gains earned by Bellvale from 2012-2014," the trial court should have based the maintenance award on "a cap of Robert's current income at $1,000,000," just as it did for purposes of the child-support award. In support of her position, Susan asserts that the trial court made a "fatal flaw" in its calculation of Robert's average income from 2012 through 2014 in that it excluded Robert's income from RSW (Robert's other primary source of income during this time

period) and his other business interests, *e.g.*, Potter's, Fiamme, and Lulu's. Thus, Susan reasons, the trial court based its maintenance calculation on "a fraction of Robert's historical income during the marriage, and an artificially reduced lifestyle analysis."

¶ 102   In response, Robert essentially reiterates the arguments he made in relation to his claim that the trial court's increase in maintenance was "illogically calculated, excessive, and a grossly inequitable windfall to Susan."

¶ 103   At the outset, we agree with Susan that the trial court should have considered Robert's income from all sources during the relevant time period in calculating his maintenance obligation. Gross income, for maintenance purposes, is defined in section 504 of the Act as "all income from all sources, within the scope of that [phrase] in Section 505 of this Act." 750 ILCS 5/504(b-3) (West 2016). As Susan correctly notes, the trial court considered the three year-average of capital gains earned by Robert from Bellvale between 2012 and 2014 but excluded Robert's income from RSW and his other business interests during the same time frame. The court's rationale for this decision was that Susan's request for $25,000 per month in maintenance "would amount to an astronomical windfall to her." While Susan disagrees with the trial court's rationale, she does not explain how such an award—which would amount to $300,000 per year—is consistent with her reasonable needs as measured by the standard of living the parties enjoyed during the marriage. See *Blume*, 2016 IL App (3d) 140276, ¶ 51; *Micheli*, 2014 IL App (2d) 121245, ¶¶ 19-20. Indeed, given the wide discretion in fashioning a maintenance award, we decline to modify the judgment to account for Robert's additional income, especially considering that while Susan testified to the amounts spent on home renovations and she testified generally to the parties' high standard of living with respect to vacations, dining out, cleaning services, and classes, she did not assign a value to many of these items.

¶ 104                                    B. Attorney Fees

¶ 105   Robert also argues that the trial court erred in awarding attorney fees in connection with count I of Susan's Contempt Petition. As noted previously, count I of the Contempt Petition alleged that Robert willfully failed to comply with the parties' judgment of dissolution of marriage, which required each party to produce to the other copies of his or her federal and state income tax returns by May 1st of each year. Robert points out that the trial court declined to hold him in contempt and asserts that because he "consistently and credibly asserted his good faith understanding that he no longer had any obligation to turn over his tax returns," the trial court's finding that his failure to comply with the turn over provision was without compelling cause or justification was erroneous. We disagree.

¶ 106   The purpose of civil contempt is to coerce compliance with some order previously entered by the court. *Berto*, 344 Ill. App. 3d at 712; *In re Marriage of Roach*, 245 Ill. App. 3d 742, 748 (1993). Where the court order has been complied with, the court need not find the respondent in contempt, but it is still necessary to determine whether any failure to pay was without cause or justification for purposes of the attorney-fee provision of section 508(b) of the Act (750 ILCS 5/508(b) (West 2016)). *Roach*, 245 Ill. App. 3d at 748. Section 508(b) of the Act provides, in pertinent part, as follows:

> "In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceedings is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party." 750 ILCS 5/508(b) (West 2016).

The policy behind section 508(b) is to eliminate the financial burden on the moving party that is

the consequence of an enforcement action. *Berto*, 344 Ill. App. 3d at 716-17. Under section 508(b), a court has no discretion whether to award attorney fees, only to determine whether the failure to pay was without cause or justification. *Berto*, 344 Ill. App. 3d at 716 (2003); *In re Marriage of Michaelson*, 359 Ill. App. 3d 706, 715 (2005). Although a finding of contempt carries with it an implicit finding that failure to comply with the order or judgment was without cause or justification, a finding of no contempt is not always a finding of cause or justification. *Berto*, 344 Ill. App. 3d at 717; *In re Marriage of Dieter*, 271 Ill. App. 3d 181, 192 (1995); *Roach*, 245 Ill. App. 3d at 748. An award of attorney fees pursuant to section 508(b) will not be overturned absent a clear abuse of discretion by the trial court. *Michaelson*, 359 Ill. App. 3d at 715. Under this standard, we will reverse only if no reasonable person could agree with the trial court. *In re Marriage of Keller*, 2020 IL App (2d) 180960, ¶ 11.

¶ 107   In this case, the record establishes that despite a demand by Susan, she did not receive copies of Robert's 2015 and 2016 tax returns until after she filed her Contempt Petition in December 2017. In its February 2019 order, the trial court declined to find Robert in indirect contempt of court because he "purged" count I of Susan's Contempt Petition by tendering his tax information and corresponding documentation prior to the hearing. However, the court also found that Robert's failure to turn over the tax return and any supporting documents was without compelling cause or justification. Nothing in the record compels a finding that the trial court's latter determination constituted an abuse of discretion. Robert suggests that he demonstrated compelling cause or justification for noncompliance with the turn-over provision of the judgment of dissolution. In support, Robert insists that he "consistently and credibly" maintained that it was his "understanding" that as of entry of the July 19, 2016, agreed order, when his child-support obligation terminated, he was no longer required under the judgment of dissolution to turn over

his tax returns to Susan on an annual basis. However, it is the duty of the trial court to assess the credibility of a witness's testimony. *Anderson*, 409 Ill. App. 3d at 199; *In re Marriage of Goesel*, 2017 IL App (3d) 150101, ¶ 16. Here, neither Judge Cerne, in denying Robert's motion to dismiss count I of Susan's petition, nor Judge Reidy in his February 2019 order, agreed with Robert's interpretation of the judgment language. Moreover, as a result of Robert's unjustified refusal to comply with the requirement that he turn over his income tax returns, Susan incurred the expense of legal action. See *Berto*, 344 Ill. App. 3d 705, 719 (2003). For these reasons, we conclude that the trial court did not abuse its discretion in awarding Susan attorney fees in connection with her Contempt Petition.

¶ 108                                III. CONCLUSION

¶ 109   For the reasons set forth above, we affirm the judgment of the circuit court of Du Page County.

¶ 110   Affirmed.